**PENN et al. v. GLENN, Collector of Internal Revenue, et al.**

No. 896.

District Court, W. D. Kentucky.

April 13, 1935.

Stoll, Muir, Townsend & Park, of Lex-ington, Ky., for plaintiffs.

T. J. Sparks, U. S. Atty., of Louisville, Ky., Frank J. Wideman, Asst. Atty. Gen., Alexander Holtzoff and Robert N. Anderson, Sp. Assts. to Atty. Gen., and Seth Thomas, Solicitor, Department of Agriculture, Arthur C. Bachrach, John J. Abt, Donald B. McGuineas, and Jack I. Levy, all of Washington, D. C., Agricultural Adjustment Administration Division, for defendants.

DAWSON, District Judge.

This is a proceeding under the Federal Declaratory Judgment Act of June 14, 1934 (adding section 274d to Judicial Code, section 400, title 28 USCA) to secure a judicial declaration that the Act of June 28, 1934, commonly known as the Kerr-Smith Tobacco Control Act (7 USCA §§ 751–766), is unconstitutional; to enjoin the defendant Glenn, as collector of internal revenue, from collecting or undertaking to collect from the plaintiffs $7,059.33, claimed by the defendant Glenn to be taxes due by the plaintiffs under the terms of the act on account of the tobacco raised and sold by them in 1934 in the state of Kentucky; and to enjoin the defendant Swinford, as District Attorney for the Eastern District of Kentucky, in which the plaintiffs reside, from prosecuting them for failure to pay such tax.

The defendants sharply challenge the authority of this court to give any of the relief prayed for:

(1) Because the Federal Declaratory Judgment Act was not intended by Congress to be available in cases arising under the revenue laws of the United States.

(2) Because section 3224, Revised Statutes (section 154, title 26 USCA), prohibits suits for the purpose of restraining the assessment or collection of any tax.

(3) Because the proceeding is, in effect, one against the United States, which cannot be maintained in the absence of the consent of the United States to be sued.

■ While the bill in this case proceeds upon the theory that the tax imposed by the Tobacco Control Act is in fact and in truth not a tax, as that word is used in section 3224, Revised Statutes (26 USCA § 154), but a penalty, exacted for the purpose of controlling the production of tobacco, nevertheless this court is powerless to grant an injunction against the collec-tion of the tax or penalty, unless the bill charges and the evidence shows such extraordinary and exceptional circumstances as to render that section inapplicable. Bailey v. George, 259 U. S. 16, 42 S. Ct. 419, 66 L. Ed. 816; Dodge v. Brady, 240 U. S. 122, 36 S. Ct. 277, 60 L. Ed. 560. No compelling reason is alleged or shown why the plaintiffs could not have paid the tax or penalty and then brought suit against the collector in the manner authorized by section 3226 of Revised Statutes, as amended (section 156, title 26 USCA), and as is specifically authorized by section 11 (b) of the act here involved (7 USCA § 761 (b). As the statutory remedy appears fully adequate in this case, there is no occasion for the granting of an injunction.

■ The defendants argue that when the question of injunction is eliminated, the sole question remaining is the constitutionality of the act, and that on this question the defendants have no more interest than has any other official of the United States; that the only interested parties are the plaintiffs and the United States, the plaintiffs being interested in having the act held unconstitutional and thus avoiding payment of the tax, and the United States in having the act held constitutional and thus authorized to collect the tax. This argument, however, while plausible, is not sound. Prior to March 3, 1839, it was the settled law that when the collector exacted taxes from a taxpayer under an unconstitutional or inapplicable statute, and payment was made under protest, the collector was personally liable for the amount thus collected, with interest; and he had the right, when payment was made under protest, to withhold the money thus collected from the Treasury until the question of the taxpayer's liability was determined. Elliott v. Swartwout, 10 Pet. 137, 9 L. Ed. 373; Bend v. Hoyt, 13 Pet. 263, 10 L. Ed. 154. On that date, however, an act was passed by Congress which required the collector to cover all taxes collected by him into the Treasury of the United States, whether paid under protest or not, and providing for a refund of the taxes to the taxpayer out of the Treasury, in event it should be determined they were improperly collected. This statute, in the case of Cary v. Curtis, 3 How. 236, 11 L. Ed. 576, was construed by the Supreme Court as relieving the collector from personal liability on account of taxes illegally or improperly collected and paid into the Treasury. Later, however,

by section 12 of an Act of March 3, 1863 (12 Stat. 741), the right was impliedly given to sue collectors in such cases; the collector being protected by a provision that should the court certify that there was probable cause for the action of the collector, or that he acted under the direction of the Secretary of the Treasury or other proper officer, no execution should issue against him, but the amount of the judgment should be paid by the Secretary of the Treasury out of the proper appropriation. This statute was carried into the Revised Statutes as section 989 (section 842, title 28 USCA). A companion piece of legislation was Revised Statutes, § 3226, which provided that no suit could be maintained in any court for the recovery of any internal revenue tax claimed to have been erroneously or illegally assessed or collected, or for the recovery of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until appeal had been duly made to the Commissioner of Internal Revenue and an adverse decision made by him, or his decision had been delayed for more than six months. This statute, in substantially the same form, has been in effect ever since its original enactment, and is now section 156, title 26 USCA. Paragraph 20, section 24, of the Judicial Code (section 41 (20), title 28 USCA), also authorizes suits in certain cases against collectors on account of taxes claimed to have been illegally or improperly collected. Under these statutes, in proper cases, federal courts do not hesitate to render judgment against collectors for taxes illegally or improperly collected by them; and it is well settled that such a suit against the collector is a personal action against him, not against the United States. In the case of Sage v. United States, 250 U. S. 33, 36, 39 S. Ct. 415, 416, 63 L. Ed. 828, the court, speaking through Mr. Justice Holmes, in discussing the nature of an action against the collector on account of taxes illegally or improperly exacted, used this language: "It is true that the statutes modify the common law liability for money wrongfully collected by duress so far as to require a preliminary appeal to the Commissioner of Internal Revenue before bringing a suit. * * * It is true also that it is the duty of the District Attorney to appear for the collector in such suits; * * * that the judgment is to be paid by the United States and the collector is exempted from execution if a certificate is granted by the Court that there was probable cause for his act. * * * But no one could contend that technically a judgment of a District Court in a suit against a collector was a judgment against or in favor of the United States. It is hard to say that the United States is privy to such a judgment or that it would be bound by it if a suit were brought in the Court of Claims. The suit is personal and its incidents, such as the nature of the defenses open and the allowance of interest, are different. It does not concern property in which the United States asserts an interest on its own behalf or as trustee, as in State of Minnesota v. Hitchcock, 185 U. S. 373, 388, 22 S. Ct. 650, 46 L. Ed. 954. At the time the judgment is entered the United States is a stranger. Subsequently the discretionary action of officials may, or it may not, give the United States a practical interest in the amount of the judgment, as determining the amount of a claim against it, but the claim would arise from the subsequent official act, not from the judgment itself."

In the case of Smietanka v. Indiana Steel Co., 257 U. S. 1, 4, 42 S. Ct. 1, 2, 66 L. Ed. 99, Mr. Justice Holmes, again writing for the court, in discussing the nature of actions against collectors for the recovery of taxes illegally or improperly exacted under the present statutes, said: "To show that the action still is personal, as laid down in Sage v. United States, 250 U. S. 33, 37, 39 S. Ct. 415, 63 L. Ed. 828, it would seem to be enough to observe that when the suit is begun it cannot be known with certainty that the judgment will be paid out of the Treasury. That depends upon the certificate of the Court in the case. It is not to be supposed that a stranger to an unwarranted transaction is made answerable for it; yet that might be the result of the suit if it could be brought against a successor to the collectorship. A personal execution is denied only when the certificate is given. It is true that in this instance the certificate has been made, but the intended scope of the action must be judged by its possibilities under the statutes that deal with it. The language of the most material enactment, Rev. St. § 989 [28 USCA § 842], gives no countenance to the plaintiff's argument. It enacts that no execution shall issue against the collector but that the amount of the judgment shall 'be provided for and paid out of the proper appropriation from the

Treasury,' when and only when the Court certifies to either of the facts certified here."

. To the same effect is Graham & Foster v. Goodcell, 282 U. S. 409–430, 51 S. Ct. 186, 75 L. Ed. 415.

The case of Patton v. Brady, 184 U. S. 608, 22 S. Ct. 493, 46 L. Ed. 713, is additional authority in support of the proposition that such suits against the collector are personal actions against him, and not against the United States. In that case it was held that such an .action, upon the death of the collector, may be revived against his personal representative. Furthermore, while it is well settled that the United States is not liable for interest except to the extent authorized by statute, yet it was early announced that in suits against the collector interest could be recovered. Erskine v. VanArsdale, 15 Wall. 75, 21 L. Ed. 63; Redfield v. Bartels, 139 U. S. 694, 11 S. Ct. 683, 35 L. Ed. 310. In view of these authorities, it seems to me beyond question that in a suit against the collector to recover taxes illegally or improperly exacted, he has a personal interest in same, entirely separate and distinct from the interest of the United States. Such being the case, when his right to collect taxes is challenged on the ground that the law under which he is proposing to collect same is unconstitutional, as is the case here, he has a direct and primary interest in that controversy. If he persists in the collection and is thereafter sued for a refund, and plaintiff is awarded judgment, that judgment must be against him, and he is personally liable thereon and subject to execution, unless the certificate provided for by section 989, Revised Statutes (section 842, title 28 USCA) is issued by the trial court. These considerations distinguish this action, in so far as it is against Glenn as collector, from such an action against an officer of the United States who has no personal stake, actual or potential, in the constitutionality of the act under attack. I accordingly conclude that the bill as amended presents a controversy between the plaintiffs and the defendant Glenn, as collector, as to the constitutionality of the act here involved; and under the recent case of Nashville, C. & St. L. Ry. Co. v. Wallace, 288 U. S. 249, 53 S. Ct. 345, 77 L. Ed. 730, 87 A. L. R. 1191, there seems to me no occasion for longer questioning the power of Congress to confer jurisdiction on federal courts to adjudicate such a controversy.

■ The defendant Swinford, as District Attorney, however, has no such direct and personal interest in the controversy as has the defendant Glenn, as collector, and as no case is alleged or made out against him for an injunction, I can conceive of no reason why he should be continued as a party defendant, and the proceeding is dismissed as to him, at the cost of plaintiffs.

■ In support of the contention that the Federal Declaratory Judgment Act was not intended by Congress to be available in cases arising under the revenue laws of the United States, counsel for the defendants argue that an action for a declaratory judgment is not maintainable where there is available another adequate remedy. While some state courts have so construed their state declaratory judgment acts, such is not the general rule, and, in my judgment, unless the act is so restricted by its terms, such a construction is not justified. There is neither expressed nor implied in the Federal Declaratory Judgment Act any such restriction upon its use; and this court is not warranted in writing into it any such restriction. I do not mean by this, however, to hold that a declaratory judgment proceeding under the Federal Act was intended to or does destroy or lessen the force of section 3224, Rev. St. (section 154, title 26 USCA), prohibiting the granting of injunctions against the collection of taxes. Just as in an ordinary equitable proceeding, an injunction against the collection of a tax cannot be granted in this character of proceeding, unless it is alleged and shown that there exist such extraordinary and exceptional circumstances as to render that section inapplicable; nor do I hold that it was intended to or does supersede the present statutory method for the recovery of taxes claimed to have been illegally or improperly exacted. The method of recovering such taxes provided by section 3226, Rev. St., as amended (section 156, title 26 USCA), is exclusive; but this is not a suit to recover such taxes. This suit, as it now stands, involves only the constitutionality of the act under which the collector intends to act. It is true the question to be decided of necessity would also be decided in a suit to recover the taxes after they had been paid, if the claim of right to recover is based upon the unconstitutionality of the act; but this fact does not make this action the equivalent of an action under section 3226, Rev. St., as amended (section 156, title 26 USCA), to recover taxes illegally collected. As applied to tax statutes, this proceeding is merely a convenient means of settling the law before payment of the tax, or after

payment of the tax and before the institution of a suit for a refund. In the absence of circumstances justifying the granting of an injunction, however, and the actual granting of an injunction, the pendency of such an action does not have the effect of delaying or hindering the collector from proceeding with the collection of the tax in the manner provided by law. If before the tax is collected, however, it is decided in a declaratory judgment proceeding that the tax cannot be legally collected, it is to be expected that the collector would respect the decision, although he would not be compelled to do so. If he did not bow to the decision, however, and later on it became necessary for the taxpayer to sue him for a refund, as is authorized by section 3226, Revised Statutes, as amended 26 USCA § 156, the trial court would probably be justified in refusing him a certificate of probable cause, and thus he and his bond would be liable for the judgment obtained. If the declaratory judgment proceeding is decided in favor of the taxpayer after the payment of the tax, it would no doubt be accepted by the Commissioner of Internal Revenue as binding upon him on an application for a refund, thus saving the expense and delay of a suit for a refund. Therefore, but for the stipulation signed by the defendant collector in this case, and which will be hereafter referred to, he would be free to proceed with the collection of the tax, notwithstanding the pendency of this action.

█ Coming to the merits of the case, it is impossible for any one who has any respect for constitutional limitations to contemplate this act with complacency. It is the plainest kind of an attempt to accomplish an unconstitutional purpose by the pretended exercise of constitutional powers. The garment used to hide the naked unconstitutionality of the act was fabricated from the commerce and taxation clauses of the Constitution; but neither congressional recitations of purpose, declarations of policy, nor the formal dress of a statute, is conclusive upon the courts. When attacked as beyond the power of Congress, a statute will be examined in its entirety, and unless the contrary plainly appears from the act itself, it will be conclusively presumed that the legislation represents a good-faith exercise of the constitutional power under which it purports to have been enacted. Collateral purposes or motives are beyond the scope of judicial inquiry. McCray v. United States, 195 U. S. 27, 24 S. Ct. 769,

49 L. Ed. 78, 1 Ann. Cas. 561; United States v. Doremus, 249 U. S. 86, 39 S. Ct. 214, 63 L. Ed. 493; Magnano Co. v. Hamilton, 292 U. S. 40, 54 S. Ct. 599, 78 L. Ed. 1109. On the other hand, if the act upon its face plainly shows that admitted constitutional powers of legislation were invoked for the primary purpose of regulating or prohibiting matters beyond the control of Congress, the legislation must be condemned. Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Bailey v. Drexel Furniture Co. (Child Labor Tax Case), 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432.

By its title the act is declared to be an act "to place the tobacco-growing industry on a sound financial and economic basis, to prevent unfair competition and practices in the production and marketing of tobacco entering into the channels of interstate and foreign commerce, and for other purposes." (48 Stat. 1275). Following the practice which seems to have become quite the fashion in recent years, especially in legislation of doubtful constitutionality, section 2 (7 USCA § 752) contains a declaration of congressional policy in this language: "It is hereby declared to be the policy of Congress to promote the orderly marketing of tobacco in interstate and foreign commerce, to enable producers of tobacco to stabilize their markets against undue and excessive fluctuations, to prevent unfair competition and practices in putting tobacco into the channels of interstate and foreign commerce, and to more effectively balance production and consumption of tobacco, and to relieve the present emergency with respect to tobacco."

█ Thus neither in the title of the act nor in the declaration of policy is there a word about taxation. Plainly, Congress attempted to justify the act under the commerce clause of the Constitution; and if the legislation could be regarded as a regulation of interstate and foreign commerce, there would be no constitutional objection to the use of the taxing power to accomplish such regulation. Board of Trustees of University of Illinois v. United States, 289 U. S. 48, 53 S. Ct. 509, 77 L. Ed. 1025, and cases there cited. The terms of the act, however, disclose beyond any question that what is sought to be regulated and controlled through taxation is the production of tobacco. This control is sought upon the theory that when production and consumption are kept in balance, a fair price will be realized by the producer.

By section 3 (a) the act (7 USCA § 753 (a) levies " * * * on the sale of tobacco with respect to which the tax is applicable a tax at the rate of 33⅓ per centum of the price for which such tobacco is sold: Provided, however, That if the Secretary of Agriculture determines and proclaims that the declared policy of this Act [chapter] is best effectuated thereby, the rate of tax shall, for such period as the Secretary of Agriculture designates, be at such lower rate (not less than 25 per centum of the price for which such tobacco is sold) as he may prescribe."

Section 3 (b), 7 USCA § 753 (b) provides: "The tax provided for by subsection (a) of this section shall be applicable to all tobacco harvested in the crop year 1934–1935, except Maryland tobacco, Virginia sun-cured tobacco, and cigar leaf tobacco. Thereafter whenever the Secretary of Agriculture determines that the persons who own, rent, share crop, or control three fourths of the land customarily engaged in the production of any particular type of tobacco favor the levy of the tax thereon and that the imposition of the tax thereon is necessary for the orderly marketing of such tobacco in interstate and foreign commerce and to effectuate the declared policy of this Act [chapter], he shall proclaim such determination at least sixty days prior to the next succeeding crop year, and the tax shall thereafter apply to tobacco of such type harvested during the crop year next following the date of such proclamation. The tax provided for by subsection (a) of this section shall not apply to any tobacco harvested after April 30, 1936."

Section 5 of the act (7 USCA § 755) ties it in with the Agricultural Adjustment Act (see 7 USCA § 601 et seq.), under which the Secretary of Agriculture is authorized to enter into voluntary crop reduction contracts with farmers; and by its provisions the Secretary of Agriculture is " * * * authorized and directed to issue (in each crop year wherein any type of tobacco is harvested to which the tax is applicable) to each contracting producer nontransferable tax-payment warrants (each such warrant to be expressed in pounds of tobacco of a particular type)."

Section 5 further provides: "Any contracting producer shall be entitled to receive such warrants covering amounts of any type of tobacco produced by him equal (1) to the number of pounds of tobacco of such type which such contracting producer is permitted to market under any agreement between him and the Secretary of Agriculture, or (2) to the number of pounds of tobacco of such type which the Secretary of Agriculture estimates may be produced on a percentage of a base acreage, which percentage and base acreage shall be determined as provided in any agreement between the Secretary of Agriculture and such contracting producer."

Under the act the contracting producer is authorized to surrender these warrants to the collector in payment of the tax due on the sale of the amount of tobacco represented by such warrants. Thus, so long as the farmer does not sell any more tobacco than he has agreed with the Secretary of Agriculture to produce, he is not required to pay any tax whatever. If he sells more than he agreed to produce, he is punished by the imposition of a tax on the sale price of the excess; and if he refuses to enter into a contract with the Secretary of Agriculture for reduction in acreage or poundage of tobacco, he is punished by being required to pay a tax of not less than 25 per cent. nor more than 33⅓ per cent. (accordingly as the rate is fixed by the Secretary of Agriculture) of the sale price of every pound he sells. A producer who is so unfortunately circumstanced that he cannot comply with the reduction contract offered him by the Secretary of Agriculture (as were the plaintiffs)[1] is in exactly the same position as the producer who refuses to contract, except that under subsection (b) of section 5, 7 USCA § 755 (b), he might secure a slight exemption from taxation if the Secretary of Agriculture in his discretion should graciously decide to extend it to him.

In view of these and other provisions of the act not necessary to mention, there seems to me no doubt whatever that the

---

[1] The regulations promulgated by the Secretary of Agriculture for the crop year 1934–1935 provided that a tenant was ineligible to sign a tobacco reduction contract with the Secretary of Agriculture unless he had a written recorded lease, giving him control of the land he was farming for both 1934 and 1935; or unless his landlord gave his written consent, if his lease was for 1934 only. Plaintiffs are tenant farmers, but their leases were such that they could not qualify as contracting producers under the regulations herein referred to, and apparently they were given no allotment of tax warrants under subsection (b) of Section 5.

sole purpose of the act is to regulate and control the production of tobacco. If I am correct in this conclusion, this purpose cannot be accomplished under the taxing power unless, as I have heretofore observed, the production of tobacco is interstate commerce, or so directly and immediately affects interstate commerce in the constitutional sense as to bring it under the regulatory power of Congress under the commerce clause. In the case of Hart Coal Corporation v. Sparks (D. C.) 7 F. Supp. 16, I held that Congress, under the commerce clause, has no power to regulate manufacture or production. In that case I thoroughly reviewed the authorities and gave the reasons for my conclusions, and nothing has been presented in this case to cause me to change the views therein expressed. To again review the authorities would unnecessarily extend this opinion.

In reaching the conclusions here announced, I have not been unmindful of the rule that ordinarily courts are reluctant to declare an act of the legislative department unconstitutional, and that all reasonable doubts are resolved in favor of its constitutionality. The reason for this rule is that courts will not presume that a co-ordinate department of the government intentionally exceeded its constitutional powers; but when the act upon its face plainly shows that the lawmaking body realized that the matters dealt with were beyond the constitutional powers of that body, and that subterfuges were resorted to to circumvent constitutional limitations, no judge who respects his oath to support and defend the Constitution will hesitate to strike it down, it matters not how great may be the demand for such legislation. For nearly one hundred and fifty years the Constitution has been the fortress behind which the individual citizen has found security against all the dangers inherent in a representative government based upon popular suffrage. Its worth has been tested by time and proven by experience. It must not be discarded or weakened to meet the exigencies of the moment.

Ordinarily, in this character of proceeding I would be authorized to go no further than to enter a decree declaring the act unconstitutional; but in this case the defendant Glenn voluntarily entered into a stipulation with the plaintiffs, by the terms of which the warehouse company through which plaintiffs' tobacco was sold was authorized to pay over to the clerk of this court the sum of $7,059.33, the amount of taxes claimed by the defendant Glenn to be due by the plaintiffs, which sum had been withheld by the warehouse company from the proceeds of the sale of plaintiffs' tobacco; the clerk to hold such sum "until the final decision of this cause and subject to the further orders of this court." An order was entered conforming to this stipulation, and the money was paid to the clerk, who holds same under the terms of that order. In this situation, there is no sound reason for requiring this money to be paid over to the collector, thus compelling the plaintiffs to file an application for a refund upon the basis of the unconstitutionality of the act, as decreed by this court. Therefore, the decree in this case will also direct that the clerk turn over the money referred to, less the 1 per cent. commission taxable against same, to the plaintiffs, the delivery not to be made, however, until the final decision of this case on appeal, provided the defendant, within thirty days from the date of the entry of the decree herein, files a written statement in the record of his intention to appeal.