**F. G. VOGT & SONS, Inc., v. ROTHENSIES, Collector of Internal Revenue.**

No. 8687.

District Court, E. D. Pennsylvania.

July 17, 1935.

J. Willison Smith, Jr., James A. Montgomery, Jr., Humbert B. Powell, and George Wharton Pepper, all of Philadelphia, Pa., for plaintiff.

Prew Savoy, Sol., Department of Agriculture, of Washington, D. C., Thomas J. Curtin, Asst. Dist. Atty., of Philadelphia, Pa., Robert N. Anderson, Sp. Asst. to Atty. Gen., Charles D. McAvoy, U. S. Atty., of Philadelphia, Pa., and Frank B. Wideman, Asst. Atty. Gen., for defendant.

KIRKPATRICK, District Judge.

This suit in equity is to restrain the collector of internal revenue from proceeding to collect a tax, and the prayer of the bill is in the alternative for injunctive relief or, in the event that such relief is not granted, then for a judgment declaring the taxing statute unconstitutional. The suit has to do with the tax levied by section 9 of the Agricultural Adjustment Act, as amended, 7 U. S. C. § 609 (7 USCA § 609), as applied to the processing of hogs. The floor stock tax levied by section 16 of that act is not involved.

The Agricultural Adjustment Act is a comprehensive scheme of legislation, the primary purpose of which, as declared, is, in substance, to restore purchasing power of agricultural commodities to its prewar level. The act proposes to attain this result chiefly by the payment to farmers of rental or benefit payments in consideration of their agreements to reduce production (section 3, 7 USCA § 603), a program which has been largely put into effect. The act also provides for "expansion of markets and removal of surplus agricultural products" (section 12 (b), 7 USCA § 612 (b), and, under this authorization, the Secretary of Agriculture has purchased such commodities in the open market and has bought and destroyed surplus farm stock. The money needed by the Secretary to do these things is to be raised by an excise tax upon the processing of certain agricultural commodities selected by him from a list set forth in the act (section 11, as amended, 7 USCA § 611). The act appropriates the proceeds of the tax to be available to the Secretary of Agriculture for carrying out its main objects. There is thus combined in one statute a plan of rehabilitation requiring large expenditures of money, a tax by which the money is raised, and an appropriation of its proceeds to the purposes of the plan. Delegated to the Secretary of Agriculture are certain powers, legislative in character, having to do (1) with the imposition and rate of the tax; (2) with accomplishing the limiting of production of agricultural commodities.

This plaintiff has no standing to challenge the constitutionality of those portions of the act which provide for the reduction program, or which delegate powers in connection therewith to the Secretary of Agriculture, or which appropriate the proceeds of the tax to that purpose. Massachusetts v. Mellon, 262 U. S. 447, 486, 43 S. Ct. 597, 67 L. Ed. 1078. As a member of a limited class upon which the tax falls, however, it may call in question the constitutionality of the taxing sections of the statute. As having a bearing upon that question, the entire statute, its aims and effect, must be considered.

The plaintiff attacks the constitutionality of the tax upon four distinct grounds, one of which I think is well taken. I have come to the conclusion that the sections of the act under which the processing tax is levied contain an invalid and unconstitutional delegation of power to the Secretary of Agriculture, thus rendering the tax void.

I. The limits of permissible delegation of legislative power by the Congress have been set in two recent decisions of the Supreme Court: Panama Refining Co. v. Ryan, 293 U. S. 388, 55 S. Ct. 241, 248, 79 L. Ed. 446, and Schechter Poultry Corporation v. United States, 55 S. Ct. 837, 79 L. Ed. 1570, decided May 27, 1935. Prior decisions recognized that there were limits; but in every case in which the question was considered the particular delegation before the court was held valid. Generally speaking, the power to delegate has been sustained as a necessary aid to the performance of the legislative function. It was accorded in cases where, if delegation of power were to be withheld, the full and free performance of that function would be frustrated.

Thus, where the law was one which was designed to take effect in the future only upon certain conditions not within the control of either the Congress or the executive, and it was essential to its purpose that it should become effective without delay upon the happening of such contingencies, it was held permissible to delegate to the executive the power to say whether those events had occurred, always, however, upon an informed fact finding, usual-

ly with the assistance of a fact-finding body. Such cases were the Brig Aurora v. United States, 7 Cranch 382, 3 L. Ed. 378; Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 504, 36 L. Ed. 294, and Hampton, Jr., & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 352, 72 L. Ed. 624. Again, where the law was for the regulation of commercial or other activities which the Congress could properly control under the commerce clause or any of its other powers, delegation of authority was sustained. These statutes in their application necessarily involved dealing with a vast multitude of varying situations calling for an expert knowledge which obviously was not available until specific instances arose and requiring a volume of technical detail which could not well be written into the act. The principle of these cases was stated by the court in the Panama Refining Co. Case as follows: "Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility." Cases of this kind were Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525, where the act had to do with establishing uniform standards of purity, quality, and fitness for all kinds of teas imported into the United States; St. Louis, I. M. & S. R. Co. v. Taylor, 210 U. S. 281, 28 S. Ct. 616, 52 L. Ed. 1061, the regulation of interstate carriers through the Interstate Commerce Commission; United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563, regulation of sheep-grazing on forest reserve of lands belonging to United States, and others.

█ The principle which sustained the delegation of legislative or quasi legislative power in all of the cases in which it was upheld was that the Congress itself had first legislated to the fullest extent reasonably practicable in view of the ends to be obtained. In other words, if delegation of legislative power is to be valid, the lawmaking body must use the power so far as it can before passing on the residue to its delegate. This is the true basis of the distinction referred to in the Panama Refining Co. Case between the "delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law," and of the vital finding in Field v. Clark, supra, that the act in question did not "in any real sense, invest the president with the power of legislation." All of these considerations apply to the delegation of authority in connection with the taxing power, though there are perhaps, in the case of internal taxes, reasons arising from the close relationship of such taxes to the life and business of the citizen why its exercise should be confined as narrowly as possible to the people's elected representatives.

Recognizing the propriety of fiscal legislation which could be adjusted to changing conditions and the necessity for some measure of delegation of power if the flexible provisions of the law were to have any real value, the court, in Hampton, Jr., & Co. v. United States, supra, said: "The same principle that permits Congress to exercise its rate-making power in interstate commerce by declaring the rule which shall prevail in the legislative fixing of rates, and enables it to remit to a rate-making body created in accordance with its provisions the fixing of such rates, justifies a similar provision for the fixing of customs duties on imported merchandise. If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." In line with what has just been said, the restriction of the last clause of the quotation is worthy of note—"is directed to conform." It would seem that in cases of delegation of the taxing power the court had in mind not only a plenary exercise of that power by the Congress, but also a close restriction if not a total denial of administrative "discretion" as to so much of it as could be properly delegated. In the Hampton Case the President was required, not permitted or authorized, to act upon the findings of the Tariff Commission. The language of the act was: "Whenever the President upon investigation * * * shall find * * * that the duties fixed in this Act [chapter] do not equalize the said differences in costs of production * * * he shall * * * ascertain said differences * * * and proclaim the changes in classifications," etc. [19 USCA § 154]. In Field v. Clark, the words of the act were: "He shall have the power, and it shall be his duty, to suspend," etc. Both of the acts considered in these cases in reality committed to the executive little more than the duty of ascer-

taining facts to which the legislation was to apply by its own force.

The Panama Refining Co. and Schechter Poultry Corp. Cases did not involve a delegation of the taxing power, but the general principles in them stated are fully applicable. In the former, the delegation was held invalid both because of total failure on the part of the Congress to legislate upon the subject-matter delegated (restriction of interstate shipments of oil) and the consequent totally unfettered discretion in that regard which was delegated to the executive. In the latter, it was held invalid because the lack of an adequate definition of the subject-matter delegated (codes of fair competition) practically amounted to a failure to legislate, with the result that the delegated powers in like manner were broadly discretionary without a clear rule or principle to confine them. Under these circumstances, in the Schechter Poultry Corp. Case, any requirement that the executive conform to the policy of the act was a practical nullity.

Examined in the light of these principles, the delegation of power contained in the processing tax feature of the Agricultural Adjustment Act is clearly invalid. It is apparent that the Secretary of Agriculture and not the Congress exercises the taxing power, and in so doing there is committed to him a discretion as to the rate of the tax as well as to its incidence which is to all practical intents unlimited.

The act must be carefully read to realize that this is the case, because it is loaded with provisions which appear to be an exercise of the power to legislate and to set up a rule to be followed by the executive. It does contain a declaration of policy and it does contain a rule which purports to restrict the Secretary of Agriculture in carrying out the policy. The statement of policy is quite as explicit as that declared in the Flexible Tariff Act (Tariff Act 1930, § 1, 19 USCA § 1001) sustained in Hampton, Jr., & Co. v. United States, supra, which was to equalize the differences in costs of production of dutiable articles in the United States and in the principal competing country. I should say that it was sufficiently definite to escape the criticism which condemned the declaration of policy of the National Recovery Act in the Schechter Poultry Corp. Case. To raise the prices of agricultural commodities to an ascertainable figure is a simple and definite object.

But did the Congress really exercise its function and impose this tax? The tax does not go into effect until action by the Secretary of Agriculture. A list of taxable articles ("basic agricultural commodities") is given in section 11. The Secretary of Agriculture may omit any article from the list, or he may not act at all, in which case no tax upon anything will be imposed; a provision which in itself is no more objectionable than that relating to the increase of duties in the Flexible Tariff Act. But in this respect (unlike the flexible tariff) his judgment need not be based upon nor controlled by his ascertainment of any facts or by the existence of any conditions predetermined by Congress as requisite to call the tax into being. The Agricultural Adjustment Act says: "When the Secretary of Agriculture determines that rental or benefit payments are to be made with respect to any basic agricultural commodity, he shall proclaim such determination, and a processing tax shall be in effect with respect to such commodity. * * *" Section 9, 7 USCA § 609. The Secretary thus is to make a determination, it is true, but it is merely his judgment that the appropriate time has come to begin rental or benefit payments, and in forming that judgment his discretion is absolute and uncontrolled. He is not required to begin making such payments at any particular time or upon the happening of any specified conditions. Nor is there any necessary relation between the imposition of the tax and his determination that rental or benefit payments are to begin. He may make the determination, put the tax into effect and use the money for open market or surplus buying, carrying on the benefit feature as a matter of form only. It seems perfectly clear that the generating event which calls this tax into being is a mental operation of the Secretary of Agriculture which is not a fact finding, but a pure exercise of discretion as to whether or not and to what extent or by what means it is advisable to carry out the general policy of the act.

As indicative of the general intent of the act to delegate not only details but the essential taxing power itself, it may be noted that section 15, as amended, 7 USCA § 615, provides that if at any time the Secretary of Agriculture finds that any article of commerce is competing with any of the basic agricultural commodities so that consumer demand is shifting away from

such commodities, he may omit the processing tax upon such commodity or he may impose by proclamation a compensating tax upon such competing commodities. He determines what the competing commodity is and what the rate of tax shall be.

Turning, now, to the rule or formula which purports to guide the exercise of the delegated power, we find that, as it is stated at the beginning of section 9 (b), as amended, 7 USCA § 609 (b), it is quite simple. The tax is to be arrived at by subtracting the current average farm price for any commodity from the fair exchange value of the commodity (a term clearly enough defined later on in the act). There is no more difficulty in ascertaining these two factors than in ascertaining the cost of production of certain articles in this country and abroad, as in the Flexible Tariff Act. The real trouble, however, is that the formula is obviously not intended and cannot, because of other provisions of the act, be a control upon the exercise of the delegated power.

After setting out the formula, the act provides that: "If the Secretary has reason to believe that the tax at such rate on the processing of the commodity generally or for any particular use or uses will cause such reduction in the quantity of the commodity or products thereof domestically consumed as to result in the accumulation of surplus stocks of the commodity or products thereof or in the depression of the farm price of the commodity, then he shall cause an appropriate investigation to be made and afford due notice and opportunity for hearing to interested parties. If thereupon the Secretary finds that any such result will occur, then the processing tax on the processing of the commodity generally, or for any designated use or uses, or as to any designated product or products thereof for any designated use or uses, shall be at such rate as will prevent such accumulation of surplus stocks and depression of the farm price of the commodity." Section 9 (b), as amended, 7 US CA § 609 (b). This provision gives the Secretary an unfettered power to fix the rate of tax at whatever figure he deems advisable to avoid a threatened accumulation of surplus. A finding is contemplated, but it is not necessarily of existing facts. It is that a certain result will occur; a prognostication of what is likely to happen. It is argued that his discretion upon this point is controlled by the policy of the act, but obviously there must be more than this. Even the statement of a definite policy and a rule will not save a delegation if the statute expressly authorizes the official to follow it or not as his judgment may dictate, even though he is to act on expert advice. Granted that, in practice, the exercise of this discretion would ordinarily mean the reduction of a rate rather than an increase, the act does not so specify, and under this provision an increase of the rate of tax beyond the point set by the formula would be fully authorized.

In addition to the foregoing, the defendant himself argues in effect that the formula is not intended to operate and does not operate as a control, except as to the initial ascertainment of the rate. He points out that the declared policy is "to establish and maintain such balance," etc., and contends that though rising prices for a commodity may automatically reduce the rate of the tax as ascertained by the formula, the Secretary may, if he should be of the opinion that a reduction would result in the balance not being maintained, disregard the formula and hold the rate at a point in excess of its upward limit. He refers to the fifth sentence of section 9 (a), 7 USCA § 609 (a), which provides: "Such rate shall be determined by the Secretary of Agriculture as of the date the tax first takes effect, and the rate so determined shall, at such intervals as the Secretary finds necessary to effectuate the declared policy, be adjusted by him to conform to such requirements." This, I agree, clearly means that the Secretary, having fixed the rate by the formula, is not required to make any downward revision of it, unless he determines that it is necessary to do so to effectuate the declared policy. He can extend the interval for adjustment as long as he thinks necessary, while in the meantime the automatic working of the formula may be giving a series of figures steadily descending below the tax which he has put in effect.

As a matter of fact, that is what has occurred, and, unless the act is so construed, the present rate is illegal by the terms of the act itself. On the basis of the latest available data the formula now gives a rate of 81 cents per hundredweight, but the rate of tax is and has been since March, 1934, $2.25, and the Secretary proposes to maintain it at that figure until he is satisfied that a reduction of the tax will not destroy the desired balance. Not only

is this the effect of the act, but the argument is a plain assertion by the defendant that the apparently definite and easily ascertained formula may be disregarded by the Secretary, leaving the policy of the act as the only semblance of control of his discretion.

The entire intent and purpose of the Agricultural Adjustment Act, as amended, 7 USCA § 601 et seq., leads irresistibly to the conclusion that in enacting the processing tax the Congress had no idea of exercising the essential legislative function in that respect, but intended to turn it over to the Secretary of Agriculture to be used by him when and if he needed it as an adjunct to the general scheme for the rehabilitation of agriculture provided for in the body of the act.

The remaining contentions of the plaintiff against the constitutionality of the tax are not sustained. But, in view of the importance of the questions involved and of the probable scope of the argument upon appeal, I think it proper for me to state briefly my views upon the other points raised.

■■ II. The plaintiff argues that the tax is not levied for a public purpose.

The interdependence of agriculture and industry, the close relationship which exists between them and other factors in our modern economic life, and the importance of agriculture as the basis upon which our entire prosperity rests, are facts well enough understood by this time to be considered matters of common knowledge. In view of this as well as of the evidence taken in this case, I am satisfied that an act of Congress, such as this, which is designed to rehabilitate agriculture, is in the interest of the whole nation, and that the raising and appropriation of money to that end is for a public purpose.

III. The plaintiff's next contention is that the taxing feature is merely a disguise under the cover of which the Congress is attempting to enter and occupy a field lying beyond the scope of the commerce clause and barred by the Tenth Amendment; the regulation of the farmers' intrastate business of producing and marketing foodstuffs.

■ There have been occasions in the past when Congress has attempted to use the broad taxing power as a means to control and regulate wholly intrastate activities. The Child Labor Tax Case, 259 U. S. 20,

42 S. Ct. 449, 66 L. Ed. 817; Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 66 L. Ed. 822. In both of these cases the taxing statute was held unconstitutional because of the evident intent, disclosed by the statute itself, to coerce manufacturers and others to conduct their business in accordance with a standard set up by the statute; the tax being plainly intended solely for a penalty for noncompliance. But it has been decided many times that, in case of a taxing statute which is intended to and will produce substantial revenue, the existence of an ulterior motive will not invalidate the act even though that motive may be to effect "ulterior ends which, considered apart, were beyond the constitutional power of the lawmakers to realize by legislation directly addressed to their accomplishment." Magnano Co. v. Hamilton, 292 U. S. 40, 47, 54 S. Ct. 599, 603, 78 L. Ed. 1109.

■■ It cannot be denied that the primary and immediate purpose of the taxing sections under consideration is to raise revenue, nor that they do as a matter of fact produce revenue and have produced it in large amounts. The fact that the money is immediately appropriated to a specific purpose does not make it any the less revenue, and, as has been pointed out, this plaintiff has no standing to interfere with the use to which it may be ultimately put. Granted that the purpose of this act is to influence farmers in the conduct of their business, that is not a regulation of commerce as to which the power of Congress is limited by the commerce clause, nor is it such an intrusion into the domestic affairs of the states as transcends the barriers set by the Tenth Amendment. There is no penalty or disadvantage applied to a departure from a course of conduct, nor is there any course of conduct specified or prescribed by the act. The co-operation of the farmers to the desired end is entirely voluntary. The act contemplates the offer of advantages or inducements to get such co-operation, but as was said with reference to another statute which, it was argued, was intended to induce a state to yield a portion of its sovereign rights, "if Congress enacted it with the ultimate purpose of tempting them to yield, that purpose may be effectively frustrated by the simple expedient of not yielding * * * nothing has been done and nothing is to be done without their consent." The same considerations apply to individuals. It may be that the inducement offered is strong

enough or subtle enough in its appeal to obtain the co-operation desired. But I know of no constitutional provision or decision of the courts which condemns the policy for that reason.

■ IV. I have come, not without doubt, to the conclusion that the tax does not contravene the Fifth Amendment. The plaintiff argues that it is arbitrary and capricious because the rate of tax bears no reasonable relation to the subject taxed, and that it is confiscatory because the rate is variable, has reached a point where it is destructive and ruinous to the business of the taxpayer, and may, so far as any limitation in the act is concerned, go higher.

I do not think that it can quite be said that the rate of tax as actually imposed bears no rational relation to the article taxed. It is a flat rate per hundredweight slaughtered. It is true that the rate is set with reference to two factors neither of which have anything but the most remote connection with the subject of the tax. They are really the farmers' income to-day and what it was in an ideal period some 20 years ago. Nevertheless, the rate as set is directly upon and in direct proportion to the value of the thing taxed, and I do not think in such case that the courts can review the reasoning or method by which that rate was arrived at merely because it is set forth in the act, any more than they could inquire into the reasons moving the Congress in fixing the rate of any excise tax, where they are not expressed.

It is true that the formula sets no upward limit to the extent to which the tax may rise. The defendant argues that it is an economic impossibility for the prices of agricultural commodities to remain at a low point while the prices of things which farmers have to buy rises so high that the the tax would become confiscatory. This may be so, although it is to be noted that in November, 1933, when the tax upon hogs was put into effect the formula yielded a rate of $4.68 per hundredweight while the farmers' price for hogs was $4.17; a possible rate of over 100 per cent. upon the price to the processor of the raw material. In March, 1934, when the present rate of $2.25 was fixed, the price of hogs was $3.88; an actual rate of over 55 per cent.

But the principle is too firmly established to question that "the judicial cannot prescribe to the legislative departments of the government limitations upon the exercise of its acknowledged powers. The pow-

er to tax may be exercised oppressively upon persons, but the responsibility of the legislature is not to the courts, but to the people by whom its members are elected. So if a particular tax bears heavily upon a corporation, or a class of corporations, it cannot for that reason only, be pronounced contrary to the Constitution." Veazie Bank v. Fenno, 8 Wall. 533, 548, 19 L. Ed. 482.

■ It is true that a federal statute passed under the taxing power of Congress may be so arbitrary and capricious as to cause it to fall before the due process clause of the Fifth Amendment. Tyler v. United States, 281 U. S. 497, 50 S. Ct. 356, 74 L. Ed. 991, 69 A. L. R. 758. This does not mean that the Fifth Amendment limits the taxing power but merely that there are cases in which what purports to be an exercise of that power may in reality be a taking of property without due process. If the tax imposed is a genuine tax and does not conflict with any constitutional limit, the courts may not hold the tax void because it is too high or may become too high. McCray v. United States, 195 U. S. 27, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561.

■ V. As to the remedy: The plaintiff may have a decree declaring the taxing provisions of the act unconstitutional in accordance with this opinion. I am entirely in accord with the views of Judge Dawson in Penn v. Glenn (D. C.) 10 F. Supp. 483, 487, to the effect that the Declaratory Judgment Act (Jud. Code § 279d, 28 USCA § 400), applies and that the occasion is a proper one for a decree under it. As to the effect of such decree, the following quotation from his opinion is in point: "If before the tax is collected, however, it is decided in a declaratory judgment proceeding that the tax cannot be legally collected, it is to be expected that the collector would respect the decision, although he would not be compelled to do so. If he did not bow to the decision, however, and later on it became necessary for the taxpayer to sue him for a refund, as is authorized by section 3226, Revised Statutes, as amended, 26 USCA § 156, the trial court would probably be justified in refusing him a certificate of probable cause, and thus he and his bond would be liable for the judgment obtained. If the declaratory judgment proceeding is decided in favor of the taxpayer after the payment of the tax, it would no doubt be accepted by the Commissioner of

232

Internal Revenue as binding upon him on an application for a refund, thus saving the expense and delay of a suit for a refund."

The matter of injunctive relief, depending in part at least upon the effect of the threatened collection upon the business and property of the individual taxpayer, matters as to which a considerable amount of evidence was adduced, and the notes of testimony not having been transcribed, will not be disposed of at this time. Meanwhile, the temporary restraining order may be extended for a further period of 10 days.