**JOHN A. GEBELEIN, Inc., v. MILBOURNE.**

No. 2328.

District Court, D. Maryland.

Aug. 13, 1935.

Supplemental Opinion Oct. 1, 1935.

J. Williston Smith, Jr., James A. Montgomery, Jr., Humbert B. Powell and George Wharton Pepper, all of Philadelphia, Pa., and John Holt Richardson, of Baltimore, Md., for plaintiff.

Frank J. Wideman, Asst. Atty. Gen., Robert N. Anderson, Sp. Asst. to Atty. Gen., Bernard J. Flynn, U. S. Atty., and C. Ross McKenrick, Asst. U. S. Atty., both of Baltimore, Md., and Seth Thomas, Sol. Dept. of Agriculture, John Henry Lewin and Prew Savoy, Sp. Attys., Office of Sol., Dept. of Agriculture, all of Washington, D. C., for defendant.

CHESNUT, District Judge.

This case involves the validity of the processing tax on hogs under the authority of the Agricultural Adjustment Act, title 7, USCA §§ 601–622.

The plaintiff, a Maryland corporation, is a processor of hogs subject to the tax. The defendant, Acting Collector of Internal Revenue for the District of Maryland, charged with the duty of collecting the tax, has filed in this Court a lien for an unpaid portion of the tax alleged to be due in the amount of $22,196. The suit takes the form of an application for an injunction to restrain the defendant from collecting the tax or for a declaratory judgment that the tax is invalid. The plaintiff alleges special and unusual circumstances of hardship which, it is contended, justify the issuance of the injunction to restrain the collection of the tax despite the provision of Rev. St. § 3224 (26 USCA § 154) (see 26 USCA § 1543). The defendant disputes the existence of the facts sufficient to confer equity jurisdiction and asserts the inapplicability of the Declaratory Judgment Act (Jud. Code § 274d, 28 USCA § 400) to this case, but does not dispute the general jurisdiction of the court with regard to the subject matter. The defendant also asserts the entire constitutionality and legal validity of the tax.

In denying the validity of the tax the plaintiff contends that:

1. The Agricultural Adjustment Act as a law is not within any of the powers conferred upon Congress by the Constitution of the United States; that looking at the Act as a whole the provisions for taxation therein are invalid because it is not really a tax imposed for public purposes but for the purpose of regulating production in the interests of farmers as a special class; that it is in violation of the 5th Amendment to the Constitution in that it takes property without due process of law, and is arbitrary, capricious and confiscatory; that the right to levy the tax involves an invalid

delegation of power; and that the Act cannot be justified as a regulation of interstate commerce or, within constitutional limitations, as an emergency measure.

2. Even if the Act providing for the tax is otherwise constitutional, nevertheless the Act is invalid because the rate of the tax now imposed is in excess of the rate permitted by the terms of the Act itself.

In condensed analysis, the Act, insofar as it relates to the processing tax on hogs, may be briefly summarized as follows: The main purposes of the Act are fairly revealed by the title which reads: "To relieve the existing national economic emergency by increasing agricultural purchasing power, to raise revenue for extraordinary expenses incurred by reason of such emergency, to provide emergency relief with respect to agricultural indebtedness, to provide for the orderly liquidation of joint-stock land banks, and for other purposes." (48 Stat. 31.) Title 1 of the Act declares as of its date, May 12, 1933, the existence of an economic emergency caused in part by "a severe and increasing disparity between the prices of agricultural and other commodities, which disparity has largely destroyed the purchasing power of farmers for industrial products, has broken down the orderly exchange of commodities, and has seriously impaired the agricultural assets supporting the national credit structure." (7 USCA § 601.) In view thereof it was the declared policy of Congress "to establish and maintain such balance between the production and consumption of agricultural commodities * * * as will reestablish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period" (7 USCA § 602); which was defined to be the prewar period, August 1909–July 1914. The policy was further declared to be "to approach such equality of purchasing power by gradual correction of the present inequalities therein at as rapid a rate as is deemed feasible in view of the current consumptive demand in domestic and foreign markets"; with the further provision in the interest of consumers that farm production should be re-adjusted at such level "as will not increase the percentage of the consumers' retail expenditures for agricultural commodities, or products derived therefrom, which is returned to the farmer, above the percentage which was returned to the farmer in the prewar period, August 1909–July 1914." (7 USCA § 602.)

To effectuate this declared policy, section 8 of the Act (7 USCA § 608) authorized the Secretary of Agriculture "to provide for reduction in the acreage or reduction in the production for market, or both, of any basic agricultural commodity, through agreements with producers or by other voluntary methods, and to provide for rental or benefit payments in connection therewith * * * in such amounts as the Secretary deems fair and reasonable, to be paid out of any moneys available for such payments."

Section 9 of the Act (7 USCA § 609), with which we are here chiefly concerned, provides for the levying of the processing tax. The purpose of the tax is stated to be "to obtain revenue for extraordinary expenses incurred by reason of the national economic emergency." It provides, "When the Secretary of Agriculture determines that rental or benefit payments are to be made with respect to any basic agricultural commodity, he shall proclaim such determination, and a processing tax shall be in effect with respect to such commodity from the beginning of the marketing year therefor next following the date of such proclamation; * * * the rate of tax shall conform to the requirements of subsection (b). Such rate shall be determined by the Secretary of Agriculture as of the date the tax first takes effect, and the rate so determined shall, at such intervals as the Secretary finds necessary to effectuate the declared policy, be adjusted by him to conform to such requirements. The processing tax shall terminate at the end of the marketing year current at the time the Secretary proclaims that rental or benefit payments are to be discontinued with respect to such commodity." (7 USCA § 609 (a).

The rate of the tax is prescribed to be "such rate as equals the difference between the current average farm price for the commodity and the fair exchange value of the commodity"; with the proviso, however, that the rate may be less in amount if the Secretary has reason to believe that the full rate authorized would (evidently by reason of consumer resistance to high prices) "cause such reduction in the quantity of the commodity or products thereof domestically consumed as to result in the accumulation of surplus stocks of the com-

modity or products thereof or in the depression of the farm price of the commodity" (7 USCA § 609 (b); such determination by the Secretary to be made after appropriate notice and opportunity for hearing to interested parties.

The fair exchange value of a commodity is defined to be "the price therefor that will give the commodity the same purchasing power, with respect to articles farmers buy, as such commodity had during the base period specified in section 2 (7 USCA § 602); and the current average farm price and the fair exchange value shall be ascertained by the Secretary of Agriculture from available statistics of the Department of Agriculture." (7 USCA § 609 (c). The term "processing" (for hogs) is defined to mean "any manufacturing or other processing involving a change in the form of the commodity or its preparation for distribution or use, as defined by regulations of the Secretary of Agriculture." (7 USCA § 609 (d) (7). By section 11 (7 USCA § 611) "basic agricultural commodity" is defined to include hogs.

For the administration of the Act, including rental and benefit payments made with respect to reduction in acreage or in respect to production for market, initial appropriations from the Treasury were made in the amount of $100,000,000, to be supplemented by the processing taxes collected under the Act.

It was further provided by the Act that it should cease to be in effect whenever the President proclaims that the national economic emergency has ended and pending that determination the President was authorized by proclamation to terminate the Act with respect to any basic agricultural commodity.

Section 14 of the Act (7 USCA § 614) provides for the separability of its provisions in the event of the unconstitutionality of any particular feature thereof.

The Act further provides for certain exemptions and compensating taxes on competing commodities with which we are not in this case directly concerned. The collection of the taxes by section 19 (7 US CA § 619) was committed to the Bureau of Internal Revenue under the direction of the Secretary of the Treasury and "such taxes shall be paid into the Treasury of the United States."

The case has been submitted for final decree upon bill, answer and a substantial amount of testimony. The principal controversy on the facts is whether the plaintiff's financial inability to pay the tax is due to the effect of the tax itself on the business, or, as contended by the defendant, is due to business inefficiency, or other causes not relating to the effect of the tax itself. The defendant has offered a substantial amount of testimony, both oral and in exhibit form, showing the general economic conditions prevailing in the country at the time of the passage of the Act, as the economic background for the declaration of Congress as to the existence of an economic emergency and justification for the declared policy. This testimony has not been controverted by the plaintiff although its legal effect is disputed. It is not considered necessary to review it at length as the economic conditions prevailing in 1933 are very well known, though the causes thereof may be the subject of controversy from the standpoint of economic theory. Apart from the numerous charts and official publications contained in the record, the situation has been very well summarized by Dr. Ezekiel, Economic Advisor to the Secretary of Agriculture, in his oral testimony. It is sufficient to say that the uncontroverted testimony in this case shows that in 1933 at the time of the passage of the Act, and for some time thereafter and at the time of the levying of the tax which is here involved, there was an abnormal lack of balance between the purchasing power resulting from the production or ownership of agricultural commodities and the products of other industries. Or, in other words, the market price for agricultural products was abnormally low in comparison with the prices of other commodities and the national credit structure, which is to a large extent based on farm lands and the agricultural industry, were seriously affected. The conditions prevailing were such that it cannot be denied that it was at least appropriate, if not the duty, of Congress, to legislate to improve the conditions to the extent that it had the power to do so within constitutional limitations. The question for judicial consideration is not whether the economic theory that was declared and acted on was essentially sound but only whether, under the facts established by the testimony in the case, there was a rational basis to justify the policy declared and the means taken to put it into effect. The essence of the policy was to reestablish gradually and to the extent economically possible, the normal balance between com-

modities of agriculture and other industries.

■ Before coming to the heart of the constitutional question some preliminary questions discussed by counsel may be adverted to and disposed of. Some support for the tax is said to lie in the emergency and temporary features of the Act. But this consideration, in my opinion, tends to obscure rather than to clarify the question of constitutional power. It is quite possible that it was within the thought of the Congress that the Act was an emergency measure within the understanding of that term as applied in Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024 (the railroad eight-hour labor law) and Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165 (District of Columbia rent case). The Act was passed prior to clarification of the relationship of emergency legislation to constitutional power in Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481. It was there pointed out that while an emergency may call into play power which otherwise exists, it does not of itself expand the constitutional grants of power. The same view has been even more recently announced in A. L. A. Schechter Poultry Corporation v. United States, 55 S. Ct. 837, 842, 79 L. Ed. 1570, 97 A. L. R. 947, May 27, 1935, as follows:

"Undoubtedly, the conditions to which power is addressed are always to be considered when the exercise of power is challenged. Extraordinary conditions may call for extraordinary remedies. But the argument necessarily stops short of an attempt to justify action which lies outside the sphere of constitutional authority. Extraordinary conditions do not create or enlarge constitutional power.

"The Constitution established a national government with powers deemed to be adequate, as they have proved to be both in war and peace, but these powers of the national government are limited by the constitutional grants. Those who act under these grants are not at liberty to transcend the imposed limits because they believe that more or different power is necessary."

Thus we find that the existence of an emergency may very properly constitute the basis of legislative policy but cannot expand constitutional power.

And it is doubtful whether the conditions affecting the agricultural industry in 1933 are properly defined as an emergency within the concept of that term as used in Wilson v. New and Block v. Hirsh. The agricultural depression was not of sudden and immediate origin, but a condition which had been developing over a period of years and was chronic rather than acute.

[2] Nor is the legislation properly to be regarded as purely temporary, because the Act undertakes not only to restore farm prices but when restored to maintain them as long as necessary to accomplish the objects of the Act. And it is made entirely clear in the testimony of the economic advisor to the Secretary that this period will doubtless last so long as world conditions affecting international trade and commerce remain as they now are; that is, until the way is opened for the export of our surplus agricultural products. The validity of the Act must therefore be envisaged as more probably long term legislation than merely as a temporary expedient.

■ Again, I cannot on the facts adopt the view contended for that the imposition of the tax is not a very serious burden on the plaintiff or that its financial difficulties are due mainly to causes unrelated to conditions brought about by the policy pursued under the Act. The plaintiff is a close corporation which is carrying on a business that has been in successful existence in the same family in Baltimore for over 70 years. The business is not very large and not very remunerative. But over a period of 10 years in the past it has paid to its president and chief owner a salary of $7,500 a year and in addition thereto has made profits on an average of a few thousand dollars a year. It still has an invested capital plant of approximately $100,000 in value after depreciation. Since the Act has been in effect a successful business has been converted into a losing one, the operating losses before depreciation but after payment of salary in 1934 being about $15,000 and in the four months of 1935 being about $12,000. I am satisfied these losses are due principally, if not wholly, to the incidence of the tax and the conditions in the business brought about by the policy pursued under the Act. In particular the losses are probably largely attributable to the inability to pass on the whole of the tax burden to the consumer. The defendant contends that the plaintiff's business has for some years been "drying up" and points to the reduc-

tion in the gross amount of dollar sales in plaintiff's business in the very recent years as compared with prior years. This, however, is due in large part, particularly in 1934, to the lower selling prices of hog products rather than to diminution in the number of hogs slaughtered. It is also suggested by the defendant that conditions affecting freight rates from the west on live hogs as compared with dressed meats are unfavorable to Baltimore packers, and also that the Baltimore public has been unwilling in recent years to pay a premium for Baltimore slaughtered hogs which had heretofore been current. As the rate differential has been of long standing it can fairly have no material effect on the plaintiff's sharp losses in 1934 and 1935. And the so-called premium decline for local products is probably bound up in the price situation resulting from the policy pursued under the Act. Nor are the recent losses peculiar to the plaintiff but, as is shown by the testimony, have similarly affected a number of other Baltimore packers. I do not, therefore, find that the plaintiff's present financial condition is due to causes unrelated to the Act.

Coming now to the first important constitutional question we find that it may be stated thus: Is it within the power of Congress to levy an excise tax on pork packers, the proceeds of which are to be paid to farmers for reduction of production for the purpose of raising the price of agricultural products and thus if possible to restore the normal balance of purchasing power of agricultural commodities in relation to other commodities?

In form the tax is not open to objection because it is expressly stated that it is levied to provide funds for the purposes of government and the proceeds of the tax are to be paid into the national treasury. It would, however, be a narrow view to stop here in the inquiry because it clearly enough appears in the Act as a whole that the taxes are substantially ear-marked and dedicated as a fund from which to defray the rental or benefit payments made to farmers as producers. The most strongly stated objection to the tax is that looking at the Act as a whole the tax is merely an incident in a scheme to regulate production which, it is said, is a matter reserved to the States under the Tenth Amendment.

In answer to this the defendant points out that the crop reduction program is a purely voluntary one without compulsion on particular farmers or farmers as a class, and it is said there is no constitutional objection to the United States through the Secretary entering into such a contract with farmers as may be authorized by Congress so long as there is no compulsion; and that there is no constitutional inhibition on Congress against making appropriations for payments thereunder.

■ It is pointed out that, by many public statements of the framers of the Constitution, or contemporaries thereof, it was definitely considered that the power of Congress to appropriate moneys for the advancement of purposes considered to be for the "general welfare," was not limited to objects covered in the powers specifically granted to Congress, and that the uniform practice of Congress, never checked by the courts, has been in accordance with this view.[1] The more precise statement would seem to be that the phrase "for the general welfare" of the United States, though a limitation on the power to levy taxes, is not itself limited to the particular objects mentioned in the several other powers specifically granted to Congress. This is indeed sound constitutional doctrine (Story on the Constitution [5th Ed.] ch. 14), but it still leaves the question as to whether this particular tax, looking at the whole of the Act, is a tax for the general welfare, or invalid because an exaction from a particular class only for the benefit of another particular class. And it should be noted that the plaintiff is not here attacking the payment to the farmers from general funds in the Treasury of the United States (and it is doubtful if it could be permitted to do so—Commonwealth of Massachusetts v. Mellon, 262 U. S. 447, 43 S. Ct. 597, 67 L. Ed. 1078), but is objecting to a tax imposed on it as an invalid tax, that is, one not collected for the general welfare.

For the general policy of the Act the most attractive argument is the history of our protective tariff which is said to furnish a close analogy. This policy of protection against foreign competition is based on the exercise of the power to levy taxes on imports and has resulted in protection of national manufacturers and their prod-

---

[1] See an interesting and able review of this subject, by District Judge Otis in Missouri Utilities Co. v. City of California, Mo. (D. C.) 8 F. Supp. 454, 455, 461, 462.

ucts. It is said the present Act is in substance the farmers' protective tariff, and it is pointed out that in general the farmer has been required heretofore to sell in an open world market (now, however, largely closed) and to buy in a protected market. It is argued that as the power to tax imports has been largely used for the building up and protection of American manufactures, it is likewise within the proper field of congressional power to exercise the power of internal revenue taxation to protect agriculture.

Furthermore, it is said that while the immediate benefits of the Act go to the farmer, the final objective is to benefit all classes of the Nation by restoring the balance of purchasing power between agriculture and industry and thus promoting the free and fair exchange of goods between the farm and factory. And in this sense the final objective of the Act is said to be for a truly public purpose in the national interests and not class legislation for the benefit of farmers.

Attractive as these considerations may appear, they do not go unchallenged in the field of economic theory. An economy of scarcity in a time of business depression is of at least debatable wisdom. And consumer resistance to artificially increased prices for staple food products very clearly manifests the attitude of the average practical man, despite the theoretical views of the economist.

██ But we must not allow the interesting economic issue to divert the thought from the question of constitutional power with which the Court is alone concerned. The exact legal issue is whether the challenged tax has been imposed by Congress within the powers granted to it by the Constitution. The affirmative power is expressed in this language:

"The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." Art. 1, § 8, cl. 1, of the Constitution.

Elsewhere there are certain express limitations on the power, affecting both the Government and the several States, with which we are not in this case concerned. It is well known that the necessity for this power was one of the chief impelling causes to the making of the Constitution.

It is of course vital to the Government, and must be and has been quite uniformly liberally construed; but nevertheless is limited by its own terms to providing for the "general welfare," where debts and common defense are not involved [Story on the Constitution (5th Ed.) c. 14; Willoughby on the Constitution (2d Ed.) vol. 1, § 61, p. 98; State of South Carolina v. United States, 199 U. S. 437, 450, 26 S. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737; United States v. Boyer (D. C.) 85 F. 425, 432], and like other great substantive powers of Congress, the power to tax is also, by necessary implication, subject to the Fifth Amendment, which requires that it shall not be exercised without due process of law. Heiner v. Donnan, 285 U. S. 312, 326, 52 S. Ct. 358, 76 L. Ed. 772; Nichols v. Coolidge, 274 U. S. 531, 542, 47 S. Ct. 710, 71 L. Ed. 1184, 52 A. L. R. 1081; Louisville Joint Stock Bank v. Radford, 55 S. Ct. 854, 79 L. Ed. 1593, 97 A. L. R. 1106, note 19, May 27, 1935. But if the power be exercised within constitutional limitations the fact that the amount of the tax is exceedingly onerous, or even ruinous, as is asserted by the present plaintiff, constitutes no legal obstacle to its enforcement. "An unlimited power to tax involves, necessarily, a power to destroy," said Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, 327, 4 L. Ed. 579. Recent pronouncements of the Supreme Court pointedly emphasize the practical reality of this familiar maxim. Fox v. Standard Oil Co., 294 U. S. 87, 99, 55 S. Ct. 333, 79 L. Ed. 1261; Stewart Dry Goods Co. v. Lewis, 294 U. S. 550, 55 S. Ct. 525, 79 L. Ed. 1054. These cases hold in effect that the courts are powerless to protect the taxpayer from destructive taxation if otherwise constitutional; and would therefore seem to emphasize the right of the taxpayer to invoke, and the duty of the courts to carefully determine and declare, the judgment of the law as to whether such a tax, as well as any other asserted power of taxation, does in legal fact conform to constitutional principles. If within the power, the only redress of the citizen is an appeal to the electorate which selects its representatives who impose and can repeal the tax. Magnano Co. v. Hamilton, 292 U. S. 40, 45, 54 S. Ct. 599, 78 L. Ed. 1109.

The exact question is whether this tax is imposed for the "general welfare" of the United States. In form the tax is not objectionable, as it is an excise uniform throughout the nation, and the proceeds are

paid into the general treasury. But in substance the whole amount of the tax is earmarked for a particular purpose. The primary objective of the Act is to increase the farmers' income. The plan of the Act is to accomplish this by (1) making voluntary agreements with farmers, to reduce their production of certain basic agricultural commodities, including hogs, (2) in consideration of which they are to receive certain rental or benefit payments, (3) the funds for which are to be realized principally from the processing taxes. Stripped of all circumlocution, what is accomplished is to collect the tax from one particular class and pay it over to another particular class, to accomplish a certain particular objective. The pork packer pays and the farmer receives. If the Act had provided simply and directly that this should be done, it would be impossible to defend the tax as one imposed for the general welfare. Citizens' Savings & Loan Association v. Topeka, 20 Wall. 655, 22 L. Ed. 455; Parkersburg v. Brown, 106 U. S. 487, 500, 1 S. Ct. 442, 27 L. Ed. 238; Cole v. La Grange, 113 U. S. 1, 6, 5 S. Ct. 416, 28 L. Ed. 896; Ochoa v. Hernandez y Morales, 230 U. S. 139, 161, 33 S. Ct. 1033, 57 L. Ed. 1427; Louisville Joint Stock Bank v. Radford, supra. Does the tax gain in constitutional validity by the complex structure of the Act, and the particular economic theory on which it is based?

It is contended in support of the alleged public purpose of the Act that, at the time of its passage, the disparity between the current prices for agricultural and industrial commodities had destroyed the normal balance of trade between the two, and that artificial efforts to restore it would be for the public welfare. The benefit to the farmer is, of course, direct and immediate, as is likewise the detriment to the taxpayer or ultimately the consumer, if the tax can be passed on to him by the processor, but the benefit to the public as a whole is at most only indirect. In some sense it is true that what benefits a particular class also benefits the whole of a nation indirectly, but heretofore this has not been considered sufficient to justify the taxation of one class for the benefit of another. Thus in the cases just cited taxation to pay interest on municipal loans to particular industrial enterprises was held to be not for a public purpose despite the indirect benefit to the municipality.

In the legal field of taxation the line of demarcation between public and private purposes has not been clearly drawn. There seems to be lacking any very definite decision as to the boundary line in federal constitutional law. And the state decisions are in seeming conflict, even when dealing with *general* taxation for the benefit of a special class of the community, distressed by economic misfortune. Cooley on Taxation (4th Ed.) vol. 1, § 215; 61 C. J. 90. It may however be assumed that the present law would follow modern thought and practice which rightly justifies placing obligation on the *public* generally to relieve such distress of a large class of a community, affected, by no wilful fault of their own, by distressful economic conditions.

But the tax here challenged is not a charge on the public generally, for the benefit of only those of a particular class who are overwhelmed by economic misfortune, but on one particular business class for the immediate benefit of all (whether unfortunate or prosperous) of another class. See State v. Matson Co. (Wash.) 47 P.(2d) 1003. Such a tax is quite unprecedented in our legal history under the Constitution. The dangers inherent in such taxation were pointed out years ago by the Supreme Court in Citizens' Savings & Loan Association v. Topeka, 20 Wall. 655, 664, 22 L. Ed. 455, where it was said:

"This power can as readily be employed against one class of individuals and in favor of another, so as to ruin the one class and give unlimited wealth and prosperity to the other, if there is no implied limitation of the uses for which the power may be exercised."

It is not doubted that in enacting the legislation Congress was actuated by the highest motives and with no intention to oppress the taxpayer, as it was probably considered that the tax could and would be passed on to the consumer. And it is not overlooked that it was the declared purpose of Congress to ultimately benefit the public, through aiding the farmer. It is contended by the defendant that the determination of Congress as to what is a public purpose must be considered final, and not subject to review by the Courts. Certainly there exists a strong presumption in favor of the legislative act, but under our form of government, there may be a review by the Courts. In Dodge v. Mission Tp., 107 F. 827, 829, 54 L. R. A. 242 (C. C. A. 8), it was said by Circuit Judge Sanborn: "A legislature cannot make a private purpose a public one by its mere

fiat, and the determination of the question in any case whether or not a given object is public or private is a judicial, and is not a legislative, function." [2]

■ In determining whether the purpose is public or private, it is important to note that the whole proceeds of the tax are to be paid over directly to farmers as a class to increase their incomes, and the benefit to the public as a whole is at most indirect, and dependent upon debatable economic theory. It is true that where public benefit is direct, incidental advantage to individuals or a class, does not defeat a tax, but here the reverse is true. In the absence of any definitive decision of the Supreme Court as to the scope of the "general welfare" clause as a limitation on the federal power to tax, and as there are other constitutional objections to the tax which are controlling, it is unnecessary to decide whether the challenged tax, viewed only as an exercise of the taxing power, is valid, as one for a public purpose. But before this new principle of permissible taxation is established it is well to contemplate the possible logical developments of the doctrine. Under it, it would be legally possible, if not politically probable, to impose a similar tax on agricultural products for the direct benefit of processors, on the felling of timber for the aid of saw mills, on the raising of sugar cane or beets for the aid of sugar refineries, and indeed on any class engaged in one branch of a whole industry for the benefit of another class in the whole process of getting the products of nature or of the factory to the ultimate consumer. The final result would be to place the regulation of all industry in the United States under the practically complete control of Congress under the taxing power.

■ This last consideration leads quite naturally to another and less debatable reason why the taxing feature of the Act cannot be sustained. Looking at the Act as a whole, it is apparent that the tax is only a means to an end, which is the control, for reduction, of production of the basic agricultural commodities of the country. This sphere of governmental action is clearly one not expressly granted to the federal government and not one impliedly necessary for the exercise of any granted power, as the "general welfare" clause is itself not an independent grant of power, but a limitation on the power to tax. If Congress has the power to control production within the States, it would seem that it would have been directly exercised. Instead of this the Act provides for voluntary reduction only, and in its opening declaration, appears to base the power exercised on the interstate commerce power, on the theory that an existing economic emergency, by seriously impairing the value of agricultural assets, has greatly retarded the exchange of agricultural and other commodities, and consequently has "burdened and obstructed the normal current of commerce," whereby transactions in agricultural commodities have become affected with a national public interest.

■ It is apparent that the underlying legal theory of the Congressional power for the Act is based on a novel conception of the scope of the interstate commerce power not warranted by decisions of the Supreme Court. Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346; Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Champlin Refining Co. v. Corporation Commission of Oklahoma et al., 286 U. S. 210, 235, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403. This same theory was advanced by counsel for the Government in support of similar contentions in this Court in United States v. Mills, 7 F. Supp. 547, involving the Petroleum Code under the National Recovery Act (48 Stat. 195), and in Royal Farms Dairy v. Wallace, 7 F. Supp. 560 and 8 F. Supp. 975, relating to the validity of licenses to milk distributors under this Agricultural Adjustment Act; but was rejected as not constitutionally sound. The untenability of the theory would seem to have been finally established by the Supreme Court in the recently decided A. L. A. Schechter Poultry Corporation Case. It seems entirely clear, therefore, that control of production within the States is a power not exercisable by the federal government under the interstate commerce power, but is reserved to the States under the Tenth Amendment. This being so it follows, as was said by Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat. 1, 199, 6 L. Ed. 23, "Congress is not empowered to tax for those purposes which are within the exclusive province of the states."

---

[2] See, also, to the same effect cases cited in 61 C. J. p. 91, note 35, including Citizens' Savings & Loan Association v. Topeka, 20 Wall. 655, 22 L. Ed. 455.

■ It is not overlooked that the Act contains a provision for the separability of its various provisions and thus the sustaining of those that are valid, despite the invalidity of others; and that this creates a presumption that the legislature would have enacted the valid part alone. Champlin Refining Co. v. Corporation Commission, 286 U. S. 210, 235, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403. But this cannot save the tax in question because it is clearly apparent from the Act as a whole that the tax is merely a means to a constitutionally unwarranted end. Child Labor Tax Case, 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432.

The seeming analogy to the Protective Tariff fails on close consideration. The latter results from a general policy as to the amount of the tax, which itself is clearly within the power expressly granted to the federal government and expressly denied to the states. As already noted, it has repeatedly been announced by the Supreme Court that a tax otherwise valid may not be defeated merely because it is highly onerous. Furthermore customs duties are not paid over directly or at all to manufacturers, but are wholly used for the general purposes of government, and such advantage as results to industry is incidental and indirect.

On the basis of the economic policy declared in the Act it may seem regrettable to some that the taxing feature of the Act cannot be upheld under the Constitution, but, as above pointed out, the Court is necessarily limited to the determination of the constitutional power. What was said by Chief Justice Taft in the Child Labor Tax Case, 259 U. S. 20, at page 37, 42 S. Ct. 449, 450, 66 L. Ed. 817, 21 A. L. R. 1432, is very pertinent here: .

"It is the high duty and function of this court in cases regularly brought to its bar to decline to recognize or enforce seeming laws of Congress, dealing with subjects not intrusted to Congress, but left or committed by the supreme law of the land to the control of the states. We cannot avoid the duty even though it require us to refuse to give effect to legislation designed to promote the highest good. The good sought in unconstitutional legislation is an insidious feature because it leads citizens and legislators of good purpose to promote it without thought of the serious breach it will make in the ark of our covenant or the harm which will come from breaking down recognized standards. In the maintenance of local self-government, on the one hand, and the national power, on the other, our country has been able to endure and prosper for near a century and a half."

■ In my opinion the taxing feature of the Act is also invalid because it involves an invalid delegation of legislative power to the Secretary of Agriculture. It is not disputed that, under our constitutional system of government, powers that are truly legislative in character may not be delegated by Congress, although administrative officers or boards may validly be authorized to execute in detail legislative enactments by Congress, where standards for action, based on appropriate findings of fact, are declared with sufficient definiteness by the Congress itself. The line of demarcation between administrative and legislative acts has recently been restated in principle and concretely applied by the Supreme Court in Panama Refining Co. v. Ryan (Amazon Petroleum Corporation v. Ryan), 293 U. S. 388, 55 S. Ct. 241, 79 L. Ed. 446, and A. L. A. Schechter Poultry Corporation v. United States, 55 S. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947, May 27, 1935. Applying the principles there announced to the processing taxes of the Agricultural Adjustment Act it seems quite clear that what has been delegated to the Secretary with respect to the imposition of the tax goes far beyond merely administrative duties and amounts substantially to legislation by him in the all important matter of taxation.

By section 8 (7 USCA § 608) the Secretary is authorized to provide for rental or benefit payments to farmers, in such amounts as he deems fair and reasonable. By section 9 (7 USCA § 609), "when the Secretary of Agriculture determines that rental or benefit payments are to be made with respect to any basic agricultural commodity, he shall proclaim such determination, and a processing tax shall be in effect with respect to such commodity from the beginning of the marketing year therefor next following the date of such proclamation." By section 9 (b) (7 USCA § 609 (b) the rate of the tax shall be "the difference between the current average farm price for the commodity and the fair exchange value of the commodity," with power, however, to the Secretary, after notice and hearing, to reduce the rate if necessary in order to avoid accumulation of surplus stocks. By section 11 (7 USCA § 611),

basic agricultural commodities subject to the processing tax include a wide variety of agricultural products, some ·of which only have been so far subjected to the processing tax by the determination of the Secretary. By section 15 (7 USCA § 615) further power and discretion is conferred upon the Secretary to impose taxes on competing commodities where disadvantage to the basic commodities selected for taxation results by reason thereof; and upon such determination of the Secretary after notice and hearing he is authorized to specify in a proclamation the competing commodity and the compensating rate of tax on the processing thereof necessary to prevent such disadvantage in competition.

It appears from these provisions that power is committed to the Secretary to determine (1) *what* to tax; (2) *when* to tax; (3) *how long* to tax; and (4) *at what rate* to tax. In cases 1, 2, and 3, the discretion of the Secretary would seem to be unlimited and unfettered except by the statement as to the general policy of the Act. And in the 4th case the limitation in the rate is in effect only a maximum which may not be exceeded when the rate is initially determined, although it appears from the facts in this case that the rate of tax now in force does in fact exceed the maximum although it did not so exceed it at the beginning of the still current season. The initial step in the imposing of the tax is a determination of the Secretary "to provide for rental or benefit payments with respect to any one of the basic agricultural commodities included in the Act." With respect to this determination the Act makes no requirement for notice or hearing or finding of fact to be made by the Secretary as a basis for the determination, and there is no provision for judicial review of his discretionary determination. It is wholly unprecedented in our political history for Congress to delegate such wide powers with respect to the vital matter of taxation to an administrative officer. The extent of the delegation far exceeds that which was upheld by the Supreme Court in the case of the flexible tariff act. J. W. Hampton, Jr., & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624. And in delegating such wide powers to a single individual the Act departs from the historic policy of the Government in such matters, which has been, where broad administrative powers are conferred, to commit them to administrative boards under acts which provide either expressly or ·impliedly for their exercise in a semi-judicial capacity and subject to ·judicial review on legal questions. Familiar illustrations are, of course, the Interstate Commerce Commission, the Federal Trade Commission, the Radio Commission and the Board of Tax Appeals.

It may also be observed. that the rate of the tax to be determined by the Secretary is on a basis which would seem to have no reasonable relation to the subject matter to be taxed. The tax is said to be an excise for the privilege of conducting the business of the processor. In such cases we would naturally expect to find the rate either definitely fixed by Congress or if subjected to a sliding scale, made to depend upon factors relating to the intrinsic nature of the particular business. But the rate for the tax here provided is of a quite different character, and is made wholly dependent upon factors which are quite extraneous to the business taxed.

The tax is made to vary with the market price for hogs received by the farmer, and the maximum of the tax is to be the difference between that current farm price and the fair exchange value of the commodity which, as is defined by the Act, is "the price therefor that will give the commodity the same purchasing power, with respect to articles farmers buy, as such commodity had during the base period [1910–1914]." 7 USCA § 609 subd. (c). The three factors in fixing the rate are, therefore (1) the market price for the commodity which prevailed twenty years ago; (2) the present market price and (3) the index price for other commodities which farmers buy as of the present time in relation to the cost of such articles to farmers twenty years ago. The mathematical problem may be simple when the determining factors are stated, but the ascertainment· of one of the governing factors is itself a complex problem. In this connection section 9 (c) of the Act (7 USCA § 609 (c) provides that "the current average farm price and the· fair exchange value shall be ascertained by the Secretary of Agriculture from available statistics of the Department of Agriculture." So far as the current market prices are concerned both for the present and for twenty years ago, the statistics are definite, but there is much more difficulty and uncertainty in determining the fair exchange value of the commodity (as defined in the Act) at the present time. It requires the use of an in-

dex figure, itself computed from other elaborate statistics, to translate prices.[3] And the problem is further complicated by the provisions of the Act in section 2 (7 USCA § 602)—declaration of policy—which seeks to limit the amount of the tax, to protect the consumers' interest, so that the current present price for the commodity "will not increase the percentage of the consumers' retail expenditures for agricultural commodities, or products derived therefrom, which is returned to the farmer, above the percentage which was returned to the farmer in the prewar period, August 1909–July 1914." The language here is certainly not conspicuously clear although it must be admitted the problem in expression, in view of the subject matter, was difficult. Looking at the several provisions of the Act with respect to the rate of the tax, it seems only reasonable to conclude that the standard set up for guidance of the Secretary in determining the amount of tax is not sufficiently definite to meet the required test for delegated powers.

The experience in the administration of the Act with respect to the rate of the processing tax on hogs illustrates the practical impossibility of initially fixing and from time to time adjusting the rate according to the formula set up by the Act with even approximate accuracy. The tax was first imposed in November, 1933. It was determined from market statistics that in the base period the price of hogs averaged $7.22 per hundred weight and of course in that period this had an equivalent purchasing power; but in November, 1933, the index figure for the cost of such articles as farmers buy was computed at 116% in relation to the base period. Using this index factor it was determined that to give to the current price in the base period ($7.22) an equivalent purchasing power in 1933 would require the fair exchange value, that is the selling price of hogs, to have been $8.38. The current average farm price at that time was, however, $3.70. The resulting tax which would have been authorized by the Act on the processor would have been $4.68 per hundred weight. It was, however, recognized that by virtue of consumer resistance and available supply of the commodity, it would have been then impossible to market hogs when processed at a price that would enable the processor to pass on that added tax to the consumer, as a result of which there would have been a further accumulation of surpluses. To meet this condition the Secretary imposed initially a tax of only 50 cents per hundred weight which, however, was authorized to be gradually increased until in March 1934, the rate of the tax was set at $2.25, which was then still far below the maximum as the average farm price for hogs was then only $3.88. But in March, 1935, due to the policy of limiting production, much accentuated by the unanticipated severe droughts of 1933-1934, the scarcity of supply of hogs for processing had become such that the actual current farm price for hogs was $8.10 with a pre-war parity of $9.17, and a computed tax of only $1.07 as compared with the actual tax then imposed at the rate of $2.25. Since then it appears that there has been a further increase in the current market price so that the amount of the tax now in force is very considerably in excess of the sum which would be authorized by the application of the mathematical formula set up in the Act. In this connection the taxpayer claims that even if the tax is otherwise valid it is now and was at the time of the filing of the bill of complaint, at a rate materially higher than the maximum authorized by section 9, and reference is particularly made to the provision thereof that, "and the rate so determined shall, at such intervals as the Secretary finds necessary to effectuate the declared policy, be adjusted by him to conform to such requirements." Defendant's counsel, however, does not construe the Act as requiring readjustment of the rate to bring it within the authorized maximum by the Secretary at definite periodic intervals, and points to the succeeding sentence of the section which reads: "The processing tax shall terminate at the end of the marketing year current at the time the Secretary proclaims that rental or benefit payments are to be discontinued with respect to such commodity. The marketing year for each commodity shall be ascertained and prescribed by regulations of the Secretary of Agriculture." It is unnecessary to decide which of these constructions of the Act is correct. But it is to be noted that the defendant's construc-

---

[3] As to the use of index figures, or price trends, to translate former value of a public utility, into present value, and the dangers of errors therein, see West v.

Chesapeake & Potomac Telephone Co. of Baltimore City, 55 S. Ct. 894, 79 L. Ed. 1640, June 3, 1935.

tion pointedly emphasizes the lack of definite limitations upon the Secretary's authority. In effect the position taken is that the origin of the tax is dependent only on the Secretary's determination to begin benefit payments, and the termination of the tax is dependent only on the Secretary's decision to discontinue such payments. There is thereby further emphasized the essential inseparability of the taxes and the benefit payments.

These considerations require the conclusion that the tax in question is invalid, on constitutional grounds, despite the strong presumption in favor of the validity of the law as an Act of Congress. The subject is of such great importance that possibly even further elaboration would be appropriate, were it not that the subject matter has been already so fully covered in the recent extended opinion of the Circuit Court of Appeals for the First Circuit in the case of Butler, Receiver of Hoosac Mills Corporation, v. United States, 78 F. (2d) 1, decided July 13, 1935 (with one Judge dissenting without opinion) in which it was held that the processing and floor taxes on cotton (also one of the basic commodities in the Act) were unconstitutional, because Congress has no power to control or regulate matters left to the states, and to lay a special tax for that purpose; and also because the Act involved an invalid delegation of the taxing power. It is needless to say that I have been much aided in reaching a conclusion on this important subject by the full discussion of the matter contained in that opinion.

I have not failed to consider the argument of defendant's counsel for the validity of the tax based on Veazie Bank v. Fenno, 8 Wall. 533, 19 L. Ed. 482, McCray v. United States, 195 U. S. 27, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561, and United States v. Doremus, 249 U. S. 86, 39 S. Ct. 214, 63 L. Ed. 493, but it appears that these cases were also cited to and found inapplicable to the present situation by the Circuit Court of Appeals for the First Circuit. Strong as is the presumption in favor of a federal taxing act, and reluctant as a District Court naturally is to hold it invalid, it seems proper for me to follow in this respect the considered opinion of the Circuit Court of Appeals which is the only appellate opinion on the particular subject. This has been the long general practice in this Court. Imbrovek

v. Hamburg-American Steam Packet Co. (D. C.) 190 F. 229, 233. And I note also that the conclusion that the tax was invalid because it depended on an invalid delegation of power was reached by District Judge Kirkpatrick for the Eastern District of Pennsylvania in a closely reasoned opinion after final hearing in the case of F. G. Vogt & Sons, Inc., v. Rothensies, Collector of Internal Revenue (D. C.) 11 F. Supp. 225, although the opinion was there expressed that the Act was otherwise constitutional. See, also, Penn v. Glenn (D. C.) 10 F. Supp. 483, holding the Kerr Smith Tobacco Control Act (7 USCA §§ 751–766) unconstitutional. But see, also, La Croix v. United States (D. C. W. D. Tenn.) 11 F. Supp. 817, holding the hog processing tax valid, and refusing an injunction.

■■■ There remains for consideration a procedural question as to whether this court has equity jurisdiction to enjoin the further collection of the processing taxes levied against the plaintiff, by the enforcement of the lien therefor heretofore filed by the Collector in this court. In opposition thereto the defendant relies on R. S. § 3224 (26 USCA § 154) which provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." But despite the generality of this provision it has been held by the Supreme Court and by other federal courts that its provisions are inapplicable where there exists extraordinary and entirely exceptional circumstances, the existence of which would, by applying the statute, leave the taxpayer without an adequate remedy at law. Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 66 L. Ed. 822; Miller, Collector, v. Standard Nut Margarine Co., 284 U. S. 498, 52 S. Ct. 260, 76 L. Ed. 422. In the latter case, 284 U. S. 498, at page 509, 52 S. Ct. 260, 263, 76 L. Ed. 422, the court said:

"Independently of, and in cases arising prior to, the enactment of the provision (Act of March 2, 1867, 14 Stat. 475) which became Rev. St. § 3224 (26 USCA § 154), this court, in harmony with the rule generally followed in courts of equity held that a suit will not lie to restrain the collection of a tax upon the sole ground of its illegality. The principal reason is that, as courts are without authority to apportion or equalize taxes or to make assessments, such suits would enable those liable for

taxes in some amount to delay payment or possibly to escape their lawful burden and so to interfere with and thwart the collection of revenues for the support of the government. And * * * in cases where complainant shows that in addition to the illegality of an exaction in the guise of a tax there exist special and extraordinary circumstances sufficient to bring the case within some acknowledged head of equity jurisprudence, a suit may be maintained to enjoin the collector. Dows v. Chicago, 11 Wall. 108, 20 L. Ed. 65; Hannewinkle v. Georgetown, 15 Wall. 547, 21 L. Ed. 231; State Railroad Tax Cases, 92 U. S. 575, 614, 23 L. Ed. 663. Section 3224 is declaratory of the principle first mentioned and is to be construed as near as may be in harmony with it and the reasons upon which it rests. Cumberland Telephone & Telegraph Co. v. Kelly (C. C. A.) 160 F. 316, 321, 15 Ann. Cas. 1210; Baker v. Baker, 13 Cal. 87, 95; Bradley v. People, 8 Colo. 599, 604, 9 P. 783; 2 Sutherland (2d Lewis Ed.) § 454. The section does not refer specifically to the rule applicable to cases involving exceptional circumstances. The general words employed are not sufficient, and it would require specific language undoubtedly disclosing that purpose, to warrant the inference that Congress intended to abrogate that salutary and well-established rule. This court has given effect to section 3224, 26 USCA § 154, in a number of cases. Snyder v. Marks, 109 U. S. 189, 191, 3 S. Ct. 157, 27 L. Ed. 901; Dodge v. Osborn, 240 U. S. 118, 121, 36 S. Ct. 275, 60 L. Ed. 557; Dodge v. Brady, 240 U. S. 122, 36 S. Ct. 277, 60 L. Ed. 560. It has never held the rule to be absolute, but has repeatedly indicated that extraordinary and exceptional circumstances render its provisions inapplicable. Hill v. Wallace, 259 U. S. 44, 52, 62, 42 S. Ct. 453, 66 L. Ed. 822; Dodge v. Osborn, supra, 240 U. S. 118, 121, 36 S. Ct. 275 [60 L. Ed. 557]; Dodge v. Brady, supra. Cf. Graham v. Du Pont, 262 U. S. 234, 257, 43 S. Ct. 567, 67 L. Ed. 965; Brushaber v. Union Pacific R. Co., 240 U. S. 1, 36 S. Ct. 236, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713."

The mere illegality of the tax, whether in whole or in part, and even though on the ground of unconstitutionality (Bailey v. George, 259 U. S. 16, 42 S. Ct. 419, 66 L. Ed. 816) is not of itself such a circumstance as will make the section inapplicable.

Probably the basic reason for the rule is that the plaintiff otherwise has an adequate remedy at law resulting from the long existing statutes providing the taxpayer may bring suit at law to recover taxes which he has been illegally required to pay. In the present case, however, it has developed, since the filing of the bill and the submission of the case for final hearing, that Congress has been seriously considering the passage of an Act, the effect of which, if passed, will be to withdraw altogether the right of the payers of this tax to sue for the recovery thereof, or to impose substantially restrictive provisions on the right of the taxpayer to recover in such case despite the possible finding that the taxes were illegally required to have been paid This matter has been brought to my attention by counsel since the argument but is a fact of public importance of which the court can take judicial notice from the reports of proceedings in Congress. The Act has not yet taken final form but it appears that the bill withdrawing entirely the right to bring suits in such cases did pass the House but was substantially amended in the Senate and, according to last available information, is now pending in conference. Of course, I cannot assume as a sole basis for action that the bill will finally be passed and approved by the President or, if so, what its final terms may be, but the imminence of the legislation which may seriously affect the plaintiff's rights of recovery of the tax now claimed to be due presents indeed an unusual situation, and the bill, if passed, will be a distinct departure from the long established policy of the Government with regard to the recovery of taxes illegally exacted. Probably the reason for this departure, if established, will lie in the view that the nature of the tax was such that it has been passed on by the taxpayer to the consumer, and it would therefore be inequitable to allow the taxpayer to profit by reason of the unusual situation. Whether the taxpayer in this case has in fact been able to pass on the tax wholly to the consumer is one of the controversial facts of the case. In any event, it would seem that, if the bill in its least advantageous form to the taxpayer as now proposed is passed the adequate remedy at law which it otherwise might have had will have been destroyed. This consideration has been considered sufficient in the last few weeks to justify many District Judges in issuing preliminary injunc-

tions against the collection of processing taxes under the Act.[4]

Independent of the pending congressional action referred to, there are exceptional circumstances in this case, which, in my opinion, render R. S. § 3224 (26 USCA § 154) inapplicable (as heretofore applied by the Supreme Court) on the basis of the conclusion that the taxing act is invalid. The plaintiff's situation is exceptionally hard and difficult if it is obliged now to pay the claimed taxes and then bring suit to recover them. The plaintiff has paid the tax since its original imposition in November, 1933, and through the year 1934 in the aggregate amount of $149,247.60. The unpaid tax for 1935 to April 20th, for part of which the Collector has filed a lien against the plaintiff's property, is in the amount of $35,905. For the year 1934 the plaintiff sustained a loss of $15,724.43, and for 1935, to April 20th, a loss of $12,193.73, which it claims (and the evidence tends quite strongly to show) was due in large part to the incidence of the tax. On December 31, 1933, the plaintiff's financial statement showed current or quick assets over current liabilities in the amount of $31,136.09, which, however, had been reduced on April 20, 1935, to $2,815.58. It appears in the case that the plaintiff is unable to borrow money to pay the taxes and if the lien for the invalid tax is. enforced it means necessarily that the plaintiff's fixed capital assets invested in its plant, worth approximately $100,000 as a going concern, must be sold to satisfy the lien, thus completely destroying the plaintiff's business, and doubtless entailing loss materially in excess of any recoverable tax, as a result of an execution sale. As a practical matter of financial fact it is therefore impossible under the circumstances of this case for the plaintiff to pay the tax and denial of injunctive relief would in fact deprive it of an adequate remedy at law by virtue of the particular circumstances. It is urged by the defendant that the plaintiff's existing financial situation is one which it could have avoided by bringing suit a year ago for recovery of the tax paid. But this does not seem to be a reasonable contention in view of the then novelty of the tax and the probable hope or expectation that it could be passed on to the consumer. A similar contention was rejected by Judge Dewey in the case of Inland Milling Co. v. Huston (D. C.) S. D. Iowa) 11 F. Supp. 813. It would seem rather that the taxpayer is entitled to credit for its effort to cooperate with the Government in paying the tax so long as it was financially possible for it to do so.

It may also be observed that the situation of the plaintiff with respect to this tax would seem not to be individually peculiar, in view of the fact that the alleged effect of the tax on Baltimore and other packers generally, as claimed by them at least, has been equally detrimental, as evidenced by some twenty or more cases of similar nature now. pending in this court and the several hundred cases which it is said are of a generally similar nature pending in other district courts of the United States. It may be further observed that the legis-

---

[4] See particularly Gold Medal Foods, Inc., v. Landy, Collector (D. C. Minn., 4th Div. Dist.) 11 F. Supp. 65, Judges Molyneaux, Nordbye, and Joyce sitting jointly; Washburn Crosby Co. v. Nee (D. C. W. D. Mo.) 11 F. Supp. 822, Otis, D. J.; Shenandoah Milling Co. v. Early (D. C. W. D. Va.) July 22, 1935, Paul, D. J. (orally); Inland Milling Co. v. Huston (D. C. S. D. Iowa) 11 F. Supp. 813, Dewey, D. J.

It appears in the United States Law Week, Vol. 2, No. 49, August 6, 1935, that "approximately 700 processing tax cases are now pending in the federal district courts. In most of these cases, restraining orders or temporary injunctions have been granted. This relief has not been awarded, however, in all cases. In fact a contrariety of opinion exists among the courts as to their power to issue injunctions in the circumstances. Final determination of all cases in which temporary injunctions have been issued is awaiting the action of Congress with respect to the right to sue for the recovery of taxes. The proposed amendment to the Agricultural Adjustment Act, including those provisions denying jurisdiction to issue injunctions to restrain collection of · the processing tax and those pertaining to suits to recover taxes paid, remain in conference between the House and the Senate. The conferees, at the time of writing, had reached no agreement as to these provisions." I note opinions in two cases (decided before publication of the opinion of the Circuit Court of Appeals for the First Circuit in the Hoosac Mills Corporation Case) in which injunctive relief was denied to processing taxpayers. Larabee Flour Mills Co. v. Nee, Collector (D. C. W. D. Mo.) 11 F. Supp. 132, Reeves, D. J.; Fisher Flouring Mills Co. v. Vierhus (D. C. W. D. Wash.) Cushman, D. J. [oral opinion].

lation was novel in character, without prior precedent, and was enacted to meet what in the Act is referred to as an "emergency situation."

The provision of R. S. § 3224 (26 USCA § 154) is an important one for the ordinary run of cases to prevent delay or interference in the collection of the ordinary revenues of the Government, and the general applicability of the statute should not be impaired or whittled away by the too easy finding of exceptional and extraordinary circumstances which render it inapplicable. The present case is, however, one of national importance dealing with a new departure in taxation based on novel and unprecedented lines, the experience under which, according to the testimony in the case, has brought about a situation of exceptional and unusual hardship to the plaintiff by reason of its prior compliance with the law and will result in extraordinary loss and irreparable damage to it unless the enforcement of the lien for the alleged overdue tax, which has been found an invalid exaction, is enjoined. Under these circumstances in my opinion a truly proper case exists of such extraordinary and special circumstances as, in accordance with recent decisions of the Supreme Court, justify the exercise of the equity jurisdiction to enjoin the collection of the tax, because in the particular case the plaintiff will be without an adequate remedy at law in the absence of such injunctive relief.

And finally it is apparent that the issuance of the injunction will be relatively more beneficial to the plaintiff than detrimental to the defendant or to the Government. It is very doubtful if the plaintiff can continue in business if the lien is enforceable. But it is quite unlikely that, even without the injunction, the Collector would proceed to the length of enforcing the lien by execution sale, in view of the adverse decision of the Circuit Court of Appeals for the First Circuit in the Hoosac Mills Corporation Case, and pending the ultimate determination of the validity of the tax by the Supreme Court. In the meantime the instant case here will doubtless be appealed and the ultimate action made dependent on the final decision of the Supreme Court.

The plaintiff has also prayed in the alternative for relief by a declaratory judgment under the authority of the recent Act of Congress approved June 14, 1934 (28 USCA § 274 (d). The applicability of this new law to the present situation has been the subject of a very marked contrariety of judicial opinion in these processing tax cases. It was held applicable by Judge Kirkpatrick in F. G. Vogt & Sons, Inc., v. Rothensies (D. C.) 11 F. Supp. 225, in the Eastern District of Pennsylvania, but inapplicable by Judge Reeves in Larabee Flour Mills Co. v. Nee (D. C.) 11 F. Supp. 132, Western District of Missouri, and by Judge Dewey in the case of Inland Milling Co. v. Huston (D. C.) 11 F. Supp. 813, Southern District of Iowa, and also by Judge Cushman in the Western District of Washington in Fisher Flouring Mills Co. v. Vierhus (D. C.). It was also held applicable to the Kerr Smith Tobacco Act (7 USCA §§ 751–766) by Judge Dawson in the Western District of Kentucky in the case of Penn v. Glenn (D. C.) 10 F. Supp. 483. In view of the conclusion already reached it is unnecessary to determine in this case whether the Declaratory Judgment Act (28 USCA § 400) is applicable to this situation.

If counsel desire more specific and detailed findings of fact than are contained in this opinion, to comply with Equity Rule 70½, 28 USCA following section 723 (which would seem to be unnecessary, in view of the consideration that the dominant questions are those of constitutional law) I shall be glad to make them upon request. A decree in accordance herewith in approved form may be submitted by counsel for signature. Costs should be payable by the defendant.

Supplemental Opinion on Further Hearing after Passage of Amendments to the Agricultural Adjustment Act.

The opinion in this case was filed August 13, 1935, but the decree was not presented by counsel until after Congress had passed extensive amendments to the Agricultural Adjustment Act by Public No. 320, 74th Congress (7 USCA § 602 et seq.), and while the Act was awaiting Presidential approval. In view of these amendments it was deemed proper to defer action on the decree presented until there could be further argument in the case by counsel for the respective parties as to the effect of the amendments on the pending case. This argument has now been heard.

■ In the opinion heretofore filed the conclusion was reached that the processing tax on hogs as provided for in the original Agricultural Adjustment Act was

invalid for two reasons: (1) That it was beyond the powers of Congress and (2) that it constituted an unauthorized delegation of the powers of Congress to the Secretary of Agriculture. By the amendment to the Act, section 21 (b), 7 USCA § 623 (b), processing taxes as heretofore determined by the Secretary of Agriculture are expressly ratified and legalized. At the recent argument counsel for the defendant contended that this ratification entirely validated the tax insofar as the defect due to an unauthorized delegation of power by Congress was concerned; but did not contend that the ratification could validate the tax insofar as it was beyond the powers of Congress. On the other hand, counsel for the plaintiff contended that the expressed ratification is lawfully ineffective to validate prior processing taxes. While not denying the power of Congress to ratify by subsequent enactments taxes previously imposed by a governmental officer or agent to whom Congress could in the first instance have delegated the power (see for instance United States v. Heinszen & Co., 206 U. S. 370, 27 S. Ct. 742, 51 L. Ed. 1098, 11 Ann. Cas. 688), nevertheless it is said that this principle cannot apply to processing taxes imposed by the Secretary of Agriculture prior to the amendment because they were imposed by an officer to whom Congress had no authority to delegate the power to tax. The Heinszen Case, supra, is said to be distinguishable on the ground that the taxing power there related to the possessions of the United States where taxation could in the first place have been lawfully delegated to a congressional agent, and therefore Congress could ratify by subsequent act what it previously could have authorized; but it is pointed out that the tax here involved was applicable to the Continental United States where it is not permissible under the Constitution for Congress to delegate the power of taxation. And it was also argued that it would be fundamentally opposed to our constitutional scheme of government to permit Congress to delegate its authority to tax to an officer of the government and then merely ratify in blanket terms the actions of the officer. The constitutional question thus presented is admitted to have no precise parallel in our prior history and presents a question of undoubted novelty and difficulty. It is, however, deemed unnecessary to decide this question at this time in this case because if the defendant's contention is correct, nevertheless, in accordance with the prior opinion in this case, the tax would still be invalid because beyond the powers of Congress. It appears, therefore, that the effect of the amendment does not change the conclusion reached on this substantive question of law in the original opinion.

 The next question is whether the amendment effects any change in the applicable procedural law with respect to the issuance of an injunction against the collection of processing taxes on hogs. In the original opinion the conclusion was reached that there existed special and extraordinary circumstances which took the case out of the general provisions of R. S. § 3224 (26 USCA § 154 [see 26 USCA § 1543]). In this respect the amendatory act does not change the situation so far as we are concerned with taxes accrued *prior* to the amendment. Section 21 (a), as added by the amendment (7 USCA § 623 (a), provides as follows: "No suit, action, or proceeding (including probate, administration, receivership, and bankruptcy proceedings) shall be brought or maintained in any court if such suit, action, or proceeding is for the purpose or has the effect of (1) preventing or restraining the assessment or collection of *any tax imposed* or the amount of any penalty or interest accrued under this title [chapter] *on or after the date* of the adoption of this amendment [August 24, 1935]." (Italics supplied.) On first reading this provision the question occurred to me whether the wording underscored was only prospective in its operation with regard to taxes or retrospective as well. But the argument has dispelled any doubt on this point. The legislative history of the amendment makes it entirely clear that the effect of the language quoted is prospective only and not retrospective. It is unnecessary to review the legislative history as counsel for both parties are agreed on this interpretation of the language. It may be noted, however, that this also was the construction of the wording by District Judges Molyneaux, Nordbye and Joyce, sitting together in the District Court of Minnesota in Gold Medal Foods v. Landy, 11 F. Supp. 65. Comparison may also be made with the wording of section 21 (d) (1), 7 USCA § 623 (d) (1), which, in referring to suits for recovery of the taxes, embraces those "which accrued *before*, on, or after the date of the adoption of the amendment [August 24, 1935]." (Italics supplied.) As no contrary decision has been called to my attention and as counsel

for the parties are definitely agreed that this is the proper construction, and as the legislative history clearly confirms it, no further discussion is necessary.

It is, however, equally clear that the language quoted does undertake to forbid injunction suits as to taxes imposed under the Act as amended on or *after* the date of the amendment. Counsel for the plaintiff do not concede that the prohibition with respect to future taxes is any more conclusive and mandatory than the provisions of R. S. § 3224 (26 USCA § 1543), as construed and applied by the Supreme Court, but, as the amendment introduced very extensive changes with respect to the processing taxes, it seems unnecessary at this time to determine the precise scope and effect of section 21 (a) with regard to taxes accruing after the date of the amendment, other than to say in this particular case at this time the injunction will be limited to taxes claimed to have accrued prior to the effective date of the amendment, August 24, 1935; especially as it is agreed by plaintiff's attorneys that the bill as filed would have to be amended or supplemented by an additional bill in order to properly raise the question with respect to taxes accruing after the amendment.

It should be added, however, that in my opinion the amendments to the Act in section 21 (d) (1) materially emphasize the existence of special and extraordinary circumstances in this case which justify the issuance of an injunction despite the provisions of R. S. § 3224 (26 USCA § 1543). Some reference to this matter was made in the original opinion in connection with the provisions of the Act then pending in Congress. It will be remembered that in the draft of the amendatory act as originally passed by the House of Representatives there was a prohibition against any suits at law for the recovery of the processing taxes; and in many injunction suits then pending in the district courts preliminary injunctions had been issued on the ground that the legislative situation affecting the Act was such as to create special and extraordinary circumstances which justified an injunction despite R. S. § 3224 (26 USCA § 1543). A number of such decisions were specifically referred to in the original opinion. In the Senate, however, a somewhat different procedural provision had been adopted which preserved, with some conditions, the right to sue and recover taxes in the customary judicial proceeding.

Section 21 (d) (1) of the amendment (7 USCA § 623 (d) (1) as finally adopted was the result of conferences between the two Houses. In effect it imposes substantially greater restrictions on a suit at law for recovery of the tax than those contained in the Senate Bill. The plaintiff's counsel contend that the effect of the present provision as finally enacted is to destroy any effective suit at law for the recovery of the tax and to make it impossible for the taxpayer to recover taxes paid although exacted under an unconstitutional act. They contend that there is now no adequate remedy at law afforded for the recovery of processing taxes once paid, and therefore the remedy by injunction is the *only* legal or equitable remedy that is available to the plaintiff in support of its constitutional rights.

Some analysis of section 21 (d) (1), 7 USCA § 623 (d) (1) is necessary. It provides in substance that there shall be no recovery for processing taxes paid unless: "After a claim has been duly filed, it shall be established * * * to the satisfaction of the Commissioner of Internal Revenue, and the Commissioner shall find and declare of record, after due notice by the Commissioner to such claimant and opportunity for hearing, that neither the claimant nor any person directly or indirectly under his control or having control over him, has, directly or indirectly, included such amount in the price of the article with respect to which it was imposed or of any article processed from the commodity with respect to which it was imposed, or passed on any part of such amount to the vendee or to any other person in any manner, or included any part of such amount in the charge or fee for processing, and that the price paid by the claimant or such person was not reduced by any part of such amount. In any judicial proceeding relating to such claim, a transcript of the hearing before the Commissioner shall be duly certified and filed as the record in the case and shall be so considered by the court." To recover the tax when paid it therefore appears that the taxpayer must establish to the satisfaction of the Commissioner of Internal Revenue that the taxpayer has not (1) included the tax paid in the *price of the article sold by him,* and (2) has not passed on *any part* of the tax to the purchaser, and (3) has not included *any part* of the tax in the charge or fee for processing, and that (4) the *price paid* by the taxpayer for the article to be processed was not *reduced by*

*any part* of the tax paid. It will be noticed that the restrictions on the right of recovery are not limited merely to proof by the taxpayer that he has not passed on the tax to his purchaser; but the taxpayer must, in order to recover, also show that no part of the tax for which he is suing to recover has been included in the *price* which he charges his purchaser; and further that no part of the tax was effective to reduce the price paid by the taxpayer as purchaser of the article processed.

Counsel for the plaintiff say with plausibility that the burden of proof thus imposed upon the taxpayer is simply impossible to discharge even though in fact the taxpayer has borne the whole or a large part of the tax for the recovery of which he is suing. And it is said that the burden of proof required is made impossible for the taxpayer to meet by virtue of the nature of the transaction and the economic conditions which surround it. The process tax for hogs is only one of the items of the whole cost in the production of pork. It is a tax on manufacture rather than a sales tax.

Of course the processor attempts to pass on the whole amount of the tax, as one of the costs of his business, to the purchaser; but his ability to do so depends upon the market conditions at the time of sale, which is made under competitive conditions, and subject to the economic law of supply and demand. The market price both for live hogs and pork products fluctuates from day to day. The amount of the tax in proportion to the sale price is such (at least in the case of the plaintiff) that he cannot absorb the tax and still sell at a profit. The testimony in this case indicates that the plaintiff has passed on the larger part of the tax to his customers, but has not succeeded in so passing on a very considerable portion thereof, possibly one-sixth. Nevertheless, on the same testimony, the defendant contended in this case, in effect, that the whole tax had been passed on by the plaintiff. The nature of the business is such that it would be at least a matter of great difficulty to determine this controversy with even approximate accuracy. Furthermore it is contended by plaintiff's counsel that the literal meaning of 21 (d) (1) would preclude the recovery of this one-sixth of the whole tax, although in my opinion this interpretation is at least debatable, and it would seem a more reasonable construction of the language that the

intention is to limit the recovery to *that portion* of the tax not passed on, or passed back, or included in the price. But at best the problem, both of fact and law, is complex and difficult. By contrast, the question as to who pays a sales tax, considered in United States v. Jefferson Electric Mfg. Co., 291 U. S. 386, 54 S. Ct. 443, 78 L. Ed. 859, is relatively simple.

There is another respect in which the remedy for recovery of the tax prescribed by section 21 (d) (1) is said to be inadequate. The provision is that in any judicial proceeding the transcript of the hearing before the Commissioner must be considered as the record in the case by the court. Here again counsel for the parties are in entire agreement as to the legal effect of the provision. Plaintiff's counsel contend, and defendant's counsel concedes, that under this provision of the amended Act there can be no hearing *de novo* in a suit brought by the taxpayer in court to recover the tax, and also there is no opportunity for a jury trial as there are no facts to be established; and that on the contrary the court proceedings will be limited to a review of the record in the case as made by the Commissioner and his findings are conclusive unless the court shall determine as a matter of law that the conclusions were wrong on the record made. And the legislative history of the section supports this view.

On first reading section 21 (d) (1) I was disposed to think that possibly it could be construed as not forbidding a hearing *de novo* in the judicial proceeding by the taxpayer despite an adverse ruling by the Commissioner, on the principle announced by the Supreme Court in United States v. Jefferson Electric Mfg. Co., supra, in applying the provisions of section 424 of the Revenue Act of 1928 (26 USCA § 2424) with regard to refund of taxes imposed on the sale of automobile accessories. But as a result of the argument of counsel on both sides I conclude that the provisions of section 21 (d) (1) go so very much further in restricting the legal remedy than did the Act of 1928, that the principle of the Jefferson Electric Mfg. Co. Case is not applicable.

We are not now considering whether the restrictions on recovery of taxes paid imposed by section 21 (d) (1) are invalid, as a denial of due process of law (see United States v. Jefferson Electric Company, 291 U. S. 386 at page 401, 54 S. Ct. 443, 78

L. Ed. 859), but only whether they constitute such a special and extraordinary situation for the taxpayer in connection with other facts of the case as justifies the issuance of an injunction against the collection of the taxes still unpaid by the plaintiff and despite the provisions of R. S. § 3224 (26 USCA § 1543). In this connection it should be observed in addition to what was said in the former opinion, that R. S. § 3224, was first enacted by section 10 of the Act of March 2, 1867 (14 Stat. 475) as an addition to section 19 of the Act of 1866 (now with amendments, USC, title 26, § 156, R. S. § 3226 [see 26 USCA §§ 1672–1673]) which permitted a suit at law with a jury trial for recovery of taxes erroneously or illegally assessed or collected. The only conditions imposed were the purely procedural ones that a petition for refund must first have been filed with and rejected by the Commissioner of Internal Revenue and the suit brought thereafter within a certain time; and this has continued, with slight amendments, to be the system prevailing to the present time with regard to internal revenue taxes generally, but (as to income and estate taxes) with the addition in 1924–26 of an optional appeal by the taxpayer to the Board of Tax Appeals, instead of a suit in the District Court against the Collector, or under certain conditions, against the United States. Snyder v. Marks, 109 U. S. 189, 3 S. Ct. 157, 27 L. Ed. 901; United States v. Jefferson Electric Mfg. Co., 291 U. S. 386, 54 S. Ct. 443, 78 L. Ed. 859; Phillips v. Commissioner, 283 U. S. 589, 597, 51 S. Ct. 608, 75 L. Ed. 1289. The prohibition as to injunctive relief against illegal taxes was therefore only an incident of a "comprehensive system of corrective justice" in the administration of tax laws, which contained the provision, for the protection of the taxpayer, of a judicial review *de novo* of the facts and law applicable to the disputed tax payment.

█ In the physical arrangement of the Revised Statutes section 3224 appears as a separate section, divorced from its original setting; and in the same manner has been included as section 154 of title 26 of the United States Code (see 26 USCA § 154). It has thus assumed the aspect of an independent principle whereas in fact it is properly only a dependent part of an integral scheme, and substantially only declaratory of the law independently of it applicable to that scheme. It gained no added force by its special situation in the Revised Statutes and in the Code. Snyder v. Marks, 109 U. S. 189, 192, 3 S. Ct. 157, 27 L. Ed. 901. And even where the scheme as a whole applied, the prohibition was not applicable when there existed special and extraordinary circumstances, constituting a basis for equity jurisdiction despite the existing remedy at law. Miller v. Nut Margarine Co., 284 U. S. 498, 509, 52 S. Ct. 260, 76 L. Ed. 422.

█ It is at least very doubtful whether R. S. § 3224 is applicable at all to the subject of these processing taxes, in view of section 21 (a) and (d) (1) of the amendment. While repeals by implication are not favored, it seems reasonably clear that 21 (d) (1) substituted a very materially different scheme for recovery, for the special case when processing taxes are paid, than the one which has so long been applicable to recovery of taxes generally, and in respect to taxes accrued but not paid, provision is made in section 21 (a) specifically with regard to the prohibition of injunctive relief applicable, however, only to subsequent and not to prior taxes. It seems unreasonable to infer that it was the intention of Congress to leave R. S. § 3224, which in legal operation was a dependent part of a different scheme for the recovery of taxes than section 21 (d) (1), still effective. If the latter amendatory section were only prospective then, of course, R. S. § 3224 would be generally applicable. But, as already noted, it is expressly made applicable to prior as well as subsequent taxes. Therefore it seems probable that the reasonable construction is to treat these amendments as constituting an entire new scheme of corrective justice applicable to the special class of taxes embraced in the Agricultural Adjustment Act as amended.

█ If, however, R. S. § 3224 is not impliedly rendered inapplicable to these processing taxes, as a matter of statutory construction, nevertheless it must, I think, be held inapplicable to the plaintiff's situation by reason of the material changes made by section 21 (d) (1) in the legal proceeding for recovery of taxes when paid. The restrictions thereby imposed on the legal remedy are such that I think it can no longer be properly said that the plaintiff has such an adequate remedy at law as precludes equitable relief. It is the very general rule in equity with regard to taxation that an injunction will lie against an invalid tax where there is no adequate remedy at law to recover the tax after payment. 26 R. C.

L. p. 464, § 417; 61 C. J. p. 1083, § 1429. And the remedy at law must be plain, full and complete. Wilson v. Illinois So. Ry. Co., 263 U. S. 574, 44 S. Ct. 203, 68 L. Ed. 456; Greene v. Louisville R. Co., 244 U. S. 499, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88, and where the statutory legal remedy is of doubtful and uncertain adequacy, the remedy by injunction is available to the taxpayer. Union Pac. R. Co. v. Board of Com'rs of Weld County, Colo., 247 U. S. 282, 38 S. Ct. 510, 62 L. Ed. 1110; Brinkerhoff-Farris Trust & Savings Co. v. Hill, 281 U. S. 673, 50 S. Ct. 451, 74 L. Ed. 1107; Atlantic Coast Line R. Co. v. Doughton, 262 U. S. 413, 426, 43 S. Ct. 620, 67 L. Ed. 1051; Fox v. Standard Oil Co., 294 U. S. 87, 94, 55 S. Ct. 333, 79 L. Ed. 780.

Section 21 (d) (1) does not meet this test. For the ordinary judicial proceeding in which both the facts and law are to be found by a court and jury, it limits the judicial proceeding to what is substantially only an appeal as to questions of law on facts found by an administrative official. The essential requisite of a judicial, as contrasted with an administrative, proceeding is that both facts and law are to be determined by an impartial and disinterested judge or jury. The Commissioner of Internal Revenue as an administrative officer does not meet this requirement. The amending section also limits the judicial review to the record in the case made before the Commissioner without provision as to how it shall be made or what it shall contain, other than the requirement that it must be after notice and hearing given to the taxpayer. There is an absence of any detailed provision with respect to how the record is to be made and on what nature of proof the findings of the Commissioner are to be based. In this respect the proceeding before the Commissioner must be much less satisfactory in the legal sense than a hearing before the Board of Tax Appeals where "there is a complete hearing de novo according to the rules of evidence applicable in courts of equity of the District of Columbia." Phillips v. Commissioner, 283 U. S. 589, 598, 51 S. Ct. 608, 612, 75 L. Ed. 1289. And the proceeding before the Board of Tax Appeals is itself only an alternative, in estate and income tax legislation, to the ordinary judicial proceeding in the district court. Where, as here, the taxpayer is asserting a constitutional right, he is entitled to the independent judgment of the courts as to both law and facts. Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 289, 40 S. Ct. 527, 64 L. Ed. 908; United Railways v. West, 280 U. S. 234, 251, 50 S. Ct. 123, 74 L. Ed. 390; State Corp. Comm. v. Wichita Gas Co., 290 U. S. 561, 569, 54 S. Ct. 321, 78 L. Ed. 519; Phillips v. Commissioner, 283 U. S. 589, 600, 51 S. Ct. 608, 75 L. Ed. 1289; Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 76 L. Ed. 598.

I have noted only a few federal cases dealing with injunctions against processing taxes since the recent amendments. The District Court for Connecticut after consideration of section 21 (d) (1) authorized a preliminary injunction in Baltic Mills Co. v. Bitgood, 12 F. Supp. 132, on August 28, 1935; while it was refused in the case of Henrietta Mills v. Hoey, 12 F. Supp. 61, in the Southern District of New York. There was also noted an opinion of the Circuit Court of Appeals for the Fifth Circuit in the case of Escalante v. Fontenot, 79 F.(2d) 343, refusing a preliminary injunction pending appeal.

The conclusion is, therefore, adhered to that the plaintiff is entitled to an injunction against the defendant with respect to the unpaid processing taxes but limited to those which had accrued up to the date of the amendments to the Act.